**CONTINUED CARE, INC., d/b/a Gulf Health Care Center, Appellant,**

v.

**June Marie Davis FOURNET, as Independent Executrix of the Estate of Captain Warren Donald Davis, Deceased, and Dan Davis and Ron Davis, as Heirs of The Estate of Captain Warren Donald Davis, Appellees.**

No. 09–97–020 CV.

Court of Appeals of Texas, Beaumont.

Submitted April 30, 1998.

Decided Nov. 12, 1998.

Rehearing Overruled Dec. 17, 1998.

Howard L. Close, Donean Surratt, Orgain, Bell & Tucker, Beaumont, for appellant.

Clay Dugas, Lauralee Vallon, Orange, for appellee.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

In this appeal, June Marie Davis Fournet, Dan Davis and Ron Davis, (Davis' Estate) initially sued D'Ann Riggs, individually and Continued Care, Inc., d/b/a Gulf Health Care Center ("Gulf Health Care"). Davis' Estate filed a negligence action against Gulf Health Care contending that D'Ann Riggs, former employee of Gulf Health Care, stole pan medication known as "Demerol" which had been prescribed for Warren Davis, a cancer patient at Gulf Health Care nursing home. In its Fifth Amended Petition, Davis' Estate alleged that Gulf Health Care was Negligent in its hiring, supervision, and retention of D'Ann Riggs as a Registered Nurse. Davis' Estate also made other negligence allegations against Gulf Health Care relating to the overall inadequate care of Warren Davis, claiming that while a resident of Gulf Health Care, Mr. Davis developed bedsores and suffered from elevated blood sugar.

Prior to the trial of this cause, Davis' Estate non-suited D'Ann Riggs, and Riggs was dismissed as a defendant in the lawsuit. The case proceeded to trial on August 12, 1996. The trial court directed verdict in favor of Gulf Health Care against plaintiffs' claims regarding Mr. Davis' high blood sugar and bedsores. The trial court denied Gulf Health Care's motion for directed verdict on the claim that Gulf Health Care's action resulted in Warren Davis' suffering pain due to not receiving his pain medication. The jury, by a 10–2 verdict, found favorably for the Davis' Estate on two issues: 1) that D'Ann Riggs stole or diverted Warren Davis' Demerol pain medication; and 2) Gulf Health Care was negligent in its supervision of D'Ann Riggs.[1] The jury awarded Davis' Estate $150,000 in damages.

---

1. Interestingly, the jury decided D'Ann Riggs was       not in the course and scope of her employment at

Judgment was entered against Gulf Health Care; Gulf Health Care filed a motion for judgment notwithstanding the verdict which was denied by the trial court. Gulf Health Care appeals from the final judgment raising two points of error.

### Point of Error No. 1

The trial court erred in not granting a directed verdict for Gulf Health Care and in not granting a judgment notwithstanding the verdict for Gulf Health Care because no evidence based upon reasonable medical probability supported a finding of an injury to Warren Davis.

### Point of Error No. 2

The trial court erred in not granting a directed verdict for Gulf Health Care Center and in not granting a judgment notwithstanding the verdict for Gulf Health Care because no evidence supported a finding that D'Ann Riggs stole Warren Davis' demerol, resulting in an injury to Warren Davis.

The evidence in this case is purely and solely circumstantial regarding the jury's answers to Jury Question No. 1 which inquired: "Do you find from a preponderance of the evidence that D'Ann Riggs stole or diverted the Demerol of Warren Davis while he was at Gulf Health Care Center and that such conduct, if any you have found, proximately caused any injury to Warren Davis?" The jury answered, "10 yes 2 no."

Jury Question No. 4, which was premised upon an affirmative answer to Jury Question No. 1, inquired as follows: "Do you find from a preponderance of the evidence that Gulf Health Care Center was negligent in supervising D'Ann Riggs and that such negligence, if any, was the proximate cause of an injury to Warren Davis?" The jury answered "10 yes."

We feel it necessary to state at the outset that the lone cause of action made the basis for the instant appeal is *negligent* failure to supervise a particular employee of Gulf Health Care, D'Ann Riggs. The elements of a negligence cause of action are a duty, a breach of that duty, and damages proximately caused by the breach of duty. *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990) (citing *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987)). Since Gulf Health Care's first point of error complains of no evidence to support a finding of injury to Warren Davis, a "damages" issue, we will assume without deciding that Gulf Health Care was satisfied that Davis' Estate met its burden of proof regarding the elements of duty, and breach of that duty. Gulf Health Care's second point of error complains of no evidence to support the finding of stolen or diverted Demerol by D'Ann Riggs resulting in an injury to Warren Davis. We see this second point of error as merely a subpart of point of error one's general complaint of no evidence to support an injury to Mr. Davis. Therefore, we will focus our inquiry on the issue of whether there was legally sufficient evidence in the record before us to prove damages to Mr. Davis proximately caused by the presumed breach of duty to Mr. Davis.

■■■ The components of proximate cause are cause in fact and foreseeability. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex. 1992). These elements cannot be established by mere conjecture, guess, or speculation. *McClure v. Allied Stores of Tex., Inc.,* 608 S.W.2d 901, 903 (Tex.1980); *Farley v. MM Cattle Co.,* 529 S.W.2d 751, 755 (Tex.1975). The test for cause in fact is whether the negligent "act or omission was a substantial factor in bringing about the injury," without which the harm would not have occurred. *Prudential Ins. Co. of America v. Jefferson Assoc., Ltd.,* 896 S.W.2d 156, 161 (Tex.1995). *See also Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458–59 (Tex.1992). Cause in fact is not shown if the defendant's negligence did no more than furnish a condition which made the injury possible. *See Bell v. Campbell,* 434 S.W.2d 117, 120 (Tex.1968). As stated in *Carey v. Pure Distrib. Corp.,*

---

the time the jury determined she stole or diverted Demerol. However, "[l]iability for negligent supervision is not dependent upon a finding that the employee was acting in the course and scope of his employment when the tortious act occurred." *Mackey v. U.P. Enterprises, Inc.,* 935 S.W.2d 446, 459 (Tex.App.—Tyler 1996, no writ).

133 Tex. 31, 124 S.W.2d 847, 849 (Tex.1939), "The evidence must go further, and show that such negligence was the proximate, and not the remote, cause of resulting injuries ... [and] justify the conclusion that such injury was the natural and probable result thereof." "In other words, even if the injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries simply may be too attenuated to constitute legal cause." *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995).

■ Foreseeability, the other aspect of proximate cause, requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 549–50 (Tex.1985). The danger of injury is foreseeable if its "general character ... might reasonably have been anticipated." *Id.* at 551 (quoting *Carey,* 124 S.W.2d at 849). The question of foreseeability, and proximate cause generally, involves a practical inquiry based on "common experience applied to human conduct." *City of Gladewater v. Pike,* 727 S.W.2d 514, 518 (Tex.1987) (quoting *Cook Consultants, Inc. v. Larson,* 700 S.W.2d 231, 236 (Tex.App.—Dallas 1985, writ ref'd n.r.e.)). It asks whether the injury "might reasonably have been contemplated" as a result of the defendant's conduct. *McClure,* 608 S.W.2d at 903. Foreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury. *See* RESTATEMENT (SECOND) OF TORTS § 435(2) (1965).

■ In the instant case, the appellees' cause of action appears to rest on the contention that Gulf Health Care failed to supervise employee D'Ann Riggs resulting in *unnecessary* or *increased* pain or suffering to Mr. Davis. It is apparently uncontested that the operative time-frame for Gulf Health Care's liability was during the sixteen-day period from May 21, 1994, up until the day Mr. Davis died, June 6, 1994. Specifically, appellees' theory was that Ms. Riggs, the director of nurses at the nursing home, either stole or otherwise diverted Mr. Davis' prescribed Demerol from him, causing Mr. Davis unnecessary or increased pain or suffering. It is uncontested that the evidence presented in support of this fact was entirely circumstantial.

The standard of review regarding a "no evidence" issue has been often repeated by the Texas Supreme Court in a variety of cases. We quote from one of the latest:

When reviewing a legal sufficiency point, this court "must consider only the evidence and inferences tending to support the trial court's finding, disregarding all contrary evidence and inferences." *Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996). However, meager circumstantial evidence from which equally plausible but opposite inferences may be drawn is speculative and thus legally insufficient to support a finding. *See ... Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993) (holding that a factual finding must be supported by more than mere surmise or suspicion).

*Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998) (citations omitted).

In the instant case, we find that the record contains merely "conjecture, guess, or speculation" with regard to the elements of cause in fact and foreseeability. Even accepting as proven the first two elements of negligence (a duty, and breach of that duty) regarding Gulf Health Care's supervision of Ms. Riggs in her capacity as director of nurses at the nursing home, the evidence rises to only speculation at best that whenever Mr. Davis complained of pain that said pain "was the natural and probable result" of Ms. Riggs being negligently supervised. While there was testimony that Ms. Riggs' nursing practices ran the spectrum from unorthodox to downright sloppy, there was simply no evidence that Ms. Riggs ever engaged in conduct that placed Mr. Davis in a position of not being able to receive his Demerol as prescribed or when needed. The fact that some ampules were broken or possibly missing is of no consequence *so long as there were enough remaining to provide Mr. Davis with an injection when needed.*

There was absolutely no testimony, or even inferences that could be drawn from testimony, to the effect that at any time during the sixteen-day period in question, Mr. Davis' supply of Demerol was completely exhausted when he needed it because of appellant's negligent supervision of Ms. Riggs. Cause in fact was simply not proven.

Proof of foreseeability was also lacking. It is undisputed that Ms. Riggs' own supervisor, Shirley Harris, testified that she was not aware of Ms. Riggs' "opiate dependency" prior to Mr. Davis' death. This was consistent with the testimony of other employees and co-workers of Ms. Riggs at the nursing home. Again, even with sufficient proof of a breach of the duty owed Mr. Davis by Gulf Health Care to the extent that said breach permitted Ms. Riggs to steal or divert *some* of Mr. Davis' Demerol, we find appellees failed to prove that the danger of an injury, i.e., manifestations of *increased* or *unnecessary* pain or suffering, to Mr. Davis could have been reasonably anticipated by Gulf Health Care. *See Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 478. We reiterate there was no evidence presented that the supply of Mr. Davis' Demerol was ever exhausted to the extent he was unable to receive an injection of the prescribed dosage at the appropriate time. Appellees' focus on the "unusual" conduct of Ms. Riggs at the nursing home during the sixteen days in question simply ignores the need to provide the required evidentiary nexus between said conduct and how Gulf Health Care might have reasonably anticipated an injury to Mr. Davis from said conduct. While we are to disregard all evidence and inferences contrary to the verdict, it simply cannot be ignored that Ms. Riggs was herself a "supervisor" of nurses and, therefore, had every right to be present at the nursing home at any hour of the day or night as the need arose. We are not ignoring the fact that there was testimony that Mr. Davis complained of pain to relatives as well as to nursing home employees. Indeed, Mr. Davis' son, Dan Davis, indicated that his father related that he (Donald Davis) "was not getting his pain medicine." Placing this testimony along side of the evidence of Ms. Riggs' "sloppy," "unprofessional" charting of Mr. Davis' medications, of the overattentiveness by Ms. Riggs to Mr. Davis, and of her appearance at the nursing home at "unusual" hours, even in the light most favorable to the verdict, still does not rise to the level of evidentiary probativeness that was necessary to place Gulf Health Care on notice so it "might reasonably have been contemplated" that Mr. Davis was in danger of unnecessary or increased pain or suffering.

All this is to say that Gulf Health Care has succeeded in its appellate burden as we find, after reviewing only the evidence and inferences in support of the verdict, the record before us reflects legally insufficient evidence to sustain the finding that Gulf Health Care negligently failed to supervise Ms. Riggs. Appellant's points of error are sustained. The trial court's judgment is reversed, and we render judgment that appellees take nothing.

REVERSED AND RENDERED.

BURGESS, Justice, dissenting.

Gulf Health Care appealed the jury's verdict raising two points of error:

*Point of Error No.1*

The trial court erred in not granting a directed verdict for Gulf Health Care and in not granting a judgment notwithstanding the verdict for Gulf Health Care because no evidence based upon reasonable medical probability supported a finding of an injury to Warren Davis.

*Point of Error No. 2*

The trial court erred in not granting a directed verdict for Gulf Health Care Center and in not granting a judgment notwithstanding the verdict for Gulf Health Care because no evidence supported a finding that D'Ann Riggs stole Warren Davis' demerol, resulting in an injury to Warren Davis.

The majority reverses the jury's verdict upon finding no evidence that the negligence of Gulf Health Care in supervising Riggs was the proximate cause of any injury to Davis.

I fail to see how Gulf Health Care's points of error raised this issue.

As the majority notes, the jury answered "yes" to Question No. 1 asking, "Do you find from a preponderance of the evidence that D'Ann Riggs stole or diverted the Demerol of Warren Davis while he was at Gulf Health Care Center and that such conduct, if any you have found, *proximately caused* any injury to Warren Davis." In their discussion under point of error one, Gulf Health Care argues there is no evidence that Riggs' appropriation of Davis' Demerol was the proximate cause of Davis' continued complaints of pain. As stated in the brief: "Davis' Estate produced no evidence that on any one day of the 16 days that Warren Davis was prescribed demerol, his complaints of pain were as a result of D'Ann Riggs stealing his demerol and not giving it to him. No medical expert testified, based upon reasonable medical probability, that on one minute or one day Warren Davis had pain *as a result of* D'Ann Riggs stealing his demerol and not giving it to him." Thus, Gulf Health Care questions the legal sufficiency of the evidence proving Riggs' theft of the Demerol proximately caused the injury. Gulf Health Care does not raise legal sufficiency of the evidence to prove that their negligence in supervising Riggs proximately caused the injury (the subject of jury Question No. 4). Clearly, this is a different issue. One which was not raised by Gulf Health Care, but only by the majority.

While we are directed to treat an issue or point "as covering every subsidiary question that is fairly included," TEX. R. APP. P. 38.1(e), we are forbidden from raising arguments for reversal *sua sponte*. As held by the Texas Supreme Court, we "may not reverse a trial court's judgment in the absence of properly assigned error." *San Jacinto River Auth. v. Duke*, 783 S.W.2d 209, 210 (Tex.1990) (citing *Texas Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex.1986); *(State Bd. of Ins. v. Westland Film Indus.*, 705 S.W.2d 695, 696 (Tex.1986)). Gulf Health Care's brief does not raise, argue, or even mention the issue of negligent supervision being a proximate cause of Davis' injury. I therefore dissent to the majority's opinion reversing the trial court's judgment on an issue not properly before this court. I now address the issues Gulf Health Care did raise.

As noted above, Gulf Health Care challenges the legal sufficiency of the evidence to support the jury's finding that Riggs proximately caused an injury to Davis by stealing his Demerol and the jury's finding that Riggs stole the Demerol. As Gulf Health Care challenges separately the proof that Riggs' stole the medication, my analysis of the first point of error assumes, as did Gulf Health Care's discussion of this issue in their brief, that Riggs' theft of Davis' Demerol was established.

In reviewing a no evidence point, we consider only the evidence and inferences tending to support the trial court's finding and disregard all evidence and inferences to the contrary. *Continental Coffee Products v. Cazarez*, 937 S.W.2d 444, 450 (Tex.1996). "Anything more than a scintilla of evidence is legally sufficient to support the finding." *Id.* The Supreme Court has further held that where the evidence relied on is circumstantial, and the circumstances are equally consistent with either of the two facts, no more than a scintilla of evidence exists to support that finding (and thus a no evidence point must be sustained). *Id.*

In their first point, Gulf Health Care argues there was no evidence, based on reasonable medical probability, that Davis' complaints of pain were caused by a lack of pain medicine. Toni Gardiner, certified nurse's assistant, Peggy Bowie, certified nurse's aide, Betty Watts, Davis' ex-wife, Shirley Harris, administrator for Gulf Health Care, Dan Davis, Davis' son, and June Fournet, Davis' daughter, all testified to Davis' complaints of pain. Brenda Wilmore testified, as a nursing expert, that based upon reasonable nursing probability, Davis "suffered greatly toward the last couple of weeks of his life." In his testimony Dr. James Giordano referenced Davis' charts which indicated complaints of severe pain.

Betty Watts, Dan Davis and June Fournet both testified that Davis repeatedly claimed he was not getting his pain medication. According to Fournet, Davis called her, her

husband, Dan's fiancee Stephanie, and her mother, asking them to bring him something for pain, saying he was "not getting any shots" and asking them to call the nurses and tell them to give him something for the pain.

Dan Davis testified to several occasions when his father received a shot after Dan arrived at the hospital and that then Davis was okay, "everything was fine." Dr. Giordano testified the dosage prescribed was appropriate for a man of Davis' size and should have provided adequate relief for two to four hours. According to Dr. Giordano, ninety to ninety-five percent of terminal cancer patients can have their pain effectively managed and controlled. Dr. Potvin, Davis' treating physician testified it was unusual that Davis still complained of plain when he had prescribed 100 milligrams of Demerol intramuscularly every two hours PRN. Dr. Potvin further testified that it would affect the pain if a patient did not receive his medication. According to Dr. Potvin, another doctor changed Davis to Demerol but he stayed with it "because it was working well." Dr. Scott McKinney, an expert witness for Gulf Health Care, testified Davis' records indicated the Demerol was effective and Davis' pain was relieved.

The testimony of Dr. Potvin and Dr. McKinney that Demerol "worked" for Davis is some evidence from which a jury could infer Davis' pain was capable of being managed. The testimony from numerous witnesses that Davis was frequently in severe pain and suffered a great deal is some evidence Davis' pain was not properly managed. This evidence supports the inference that Riggs' diversion of Davis' medication was the reason his pain was not properly managed. There is certainly more than a scintilla of evidence to support the jury's finding that Davis' pain was due to Riggs' actions. It is not an "equally plausible but opposite inference" that Davis received all his pain medication and was still in severe pain, *Wal–Mart Stores, Inc. v. Gonzalez*, 968 S.W.2d 934, 936 (Tex.1996), because the evidence received at trial, tending to support the trial court's finding, was that when Davis received his medication, it worked, but that Davis did not always receive his medication. Thus, the circumstantial evidence is not "equally consistent with either of two facts" but only consistent with one—that Riggs' diversion of Davis' pain medication caused Davis' pain. *Continental Coffee Products Co.*, 937 S.W.2d at 450. Therefore, I would overrule Gulf Health Care's first point of error.

In their second point, Gulf Health Care challenges the legal sufficiency of the evidence that Riggs' stole Davis' Demerol. Thus, set forth below are the evidence and inferences tending to support the jury's finding that Riggs did steal Davis' Demerol.

Toni Gardiner testified it was unusual for Riggs, as the director of nurses, to personally administer pain medication to Davis. Toni had previously worked at five or six health-related facilities and had never known the director of nurses to administer pain medication to a patient which, according to Toni, was the L.V.N.'s job. Toni also thought it unusual that Riggs was often at the nursing home at 5:00 a.m. even though her normal working hours were from 8:00 a.m. to 5:00 p.m. Toni testified Davis was the only patient Riggs cared for personally and that she did not see Riggs work with any other patient.

Kimberly Fournet,[1] L.V.N., testified when she was Davis' charge nurse it was her duty to medicate him but she never did. Kimberly recalled that several times Riggs told her in the morning, "I want to take care of Captain Davis today. He's my personal patient." Kimberly thought that unusual because a director of nurses is busy and does not really have time to take care of a particular patient when there were 120 patients in the facility. Kimberly did not know of Riggs asking to take care of any patient other than Davis and testified Davis was the only patient at that time taking Demerol. Kimberly recalled Riggs' request to take care of Davis as being around the same time that he was prescribed Demerol. Kimberly found the number of times Riggs logged out Demerol surprising as well as when it was logged out, from 11:00 p.m. to 7:30 a.m., approximately every two hours. Kimberly testified the medication administration sheet for the Dem-

---

1. Kimberly Fournet is no relation to June Fournet.

erol was not procedurally correct. According to Kimberly, Riggs is the person in charge of handling and making sure all the charts are in correct order, making it even more unusual that the Demerol chart was so poorly kept. Kimberly testified there was no tolerance for being off on the count of Demerol, they had to account for every single vial.

Paul McCoppin, L.V.N., testified he became suspicious of the Demerol record because it showed entries on one date spanning three different shifts, all by Riggs. He found it suspicious that Riggs would medicate someone all through the day and night, into the early hours of the next morning, as the chart indicated Riggs had done. McCoppin could not explain how the chart showed seven vials remaining on May 25, but on May 28, showed eight vials remaining. According to McCoppin, this was the first time he knew of a director of nurses taking on the role of medicating patients.

McCoppin spoke with the administrator, Shirley Harris, with Riggs present, regarding his suspicions. He informed her of the events in the past with broken vials and syringes left in the medication box that he was told had medication in them. Entries indicated syringes were drawn up ahead of time for another nurse to administer. McCoppin testified a syringe is not supposed to be drawn unless the medication is about to be given and a syringe was not to be drawn up and left in a medication box because the person administering the medication could not be certain what was in the syringe. Kimberly Fournet also testified it was never acceptable to draw up more than one syringe for a patient if it were not going to be used at that time or for one nurse to take out medication and another nurse administer it; the nurse that takes out the medication is always supposed to administer it. McCoppin noted entries also provided the syringes only had half the dosage they were supposed to contain and stated "Leaked in box." McCoppin testified Demerol does not "leak out" of syringes.

McCoppin stated that Demerol in injectable form is a clear liquid that looks like water. McCoppin said he could not look at a syringe and say whether or not it contained Demerol if it contained a clear liquid. Davis was prescribed Phenergan, also a clear liquid, along with the Demerol. According to McCoppin, you could not tell by looking at a syringe whether it was all Phenergan or part Demerol and part Phenergan. McCoppin also informed Harris of his concerns about the strange hours Riggs was charting on Davis' chart as well as the number of times she was charting for Demerol. McCoppin pointed out to Harris that on one occasion when Davis needed medication, instead of using one of the syringes in the box supposedly containing Demerol another vial was used. An entry indicated the liquid in the syringes was wasted but it was not identified as Demerol. Rather, the entry provided another nurse "Witnessed wasting of unknown liquid." McCoppin said he told Harris he was not comfortable with the working environment concerning the medications and was told by Harris if he did not like what was going on, he could leave, which he did.

Davis' chart had a lot of recording about vials breaking but McCoppin testified he never unintentionally broke a vial of Demerol. McCoppin said the lock on the box containing the Demerol could be taken off without opening the lock, which was not the way narcotics are supposed to be kept. McCoppin testified he did not see the type of discrepancies and errors on Davis' Demerol chart on any other medication or patient. It appeared to McCoppin that the charting created an opportunity for someone to divert narcotic medication. McCoppin testified entries on the narcotic sheet count looked like they had been written through or over and it was those types of charting discrepancies that caught his attention and raised his suspicions.

Peggy Bowie, nurse's aide, testified she never saw Riggs medicate Davis. Bowie said Riggs always asked her to step out of the room when she was giving Davis his medication, which Bowie thought was unusual. Bowie also found it unusual that Riggs would medicate Davis herself. Bowie did not know of Riggs medicating any other patients. Bowie agreed that every time Davis was due a pain shot on her shift, Riggs said she was going to give him his medicine. According to

Bowie, the director of nurses at Gulf Health Care worked from 8:00 a.m. to 5:00 p.m. unless there was a severe emergency, a death, or police reports of medication missing.

Dr. Potvin testified the charting of Davis' Demerol did not look right. Dr. Potvin could not explain the notation that one vial leaked out since, according to Dr. Potvin, ampoules do not leak, they break. Dr. Potvin said he had not broken many because they are "pretty tough to break." When questioned about the notation "Two syringes drawn up. One to see if count was being counted; one for T. Roach to give," Dr. Potvin testified medication would not be drawn up unless it were intended to be given immediately to a patient. He said he had never seen anything like that before and it was unusual. Dr. Potvin found it very unusual for a nurse to draw up syringes of a Class 2 narcotic to try and trap somebody. Dr. Potvin also found it unusual that the Demerol ampoules were being cracked or broken. An entry on Davis' records indicated that on June 5, 1994, the wasting of an unknown liquid was witnessed but it was not signed by L. Murray, L.V.N., until June 13, 1994, a week after Davis died. Dr. Potvin agreed it was unusual that a week after Davis died someone went back to his Demerol records and made a notation, explaining that a witness is needed when medication is destroyed and the witness has to sign. Dr. Potvin agreed that in light of the records, Riggs' history, and the allegations that Riggs stole Davis' Demerol, suspicions were raised in his mind.

Dr. Jim Giordano testified Davis' Demerol charts were unusual in that they were not done to standard and were haphazard, making it very difficult for shift-changing personnel to determine what was done by the previous shift: Dr. Giordano noted entries were out of order, there were erasures, cross-outs, incidences of breakage and spillage that were circled and taken out of context. Dr. Giordano said he had worked around Demerol ampoules to a fair extent and had never seen one unintentionally broken. Davis' records indicated that on June 1, at 1:04 p.m. Shaunette Stiller gave Davis his medication and noted "effective results." The next entry

was made at 1:18 p.m., fourteen minutes later, by Riggs' and provided she medicated Davis for pain with 100 mg of Demerol. Dr. Giordano testified he would not give 100 mg of Demerol after achieving effective results fourteen minutes earlier. Dr. Giordano testified he did not believe Davis was given two doses of 100 mg of Demerol just fourteen minutes apart on June 1, as the chart indicated, because if he had been, Davis would have gone into acute arrest.

The chart had an entry of "broken vials" but Dr. Giordano could not tell from the chart what happened to the Demerol in those vials. Dr. Giordano also could not tell from the chart whether the Demerol drawn up in syringes had been wasted. Dr. Giordano testified that because Demerol is a controlled substance, the disposal has to be witnessed. Dr. Giordano noted an occasion in the chart where one nurse withdrew the medication and another administered it. Dr. Giordano said for a narcotic, the same person taking out the medication should administer it. Dr. Giordano had difficulty in certain instances tracking the course of the Demerol from when it was withdrawn to when it was administered. He further noted inconsistencies between the Medication Administration Record and the narcotic count sheet, which were supposed to be consistent.

Rene Thompson, R.N., testified Riggs was in charge of making sure the medication was accounted for at Gulf Health. Thompson testified that for two of the entries it appeared the time had been written over and changed. Both of those entries were by Riggs. Thompson was unable to tell from the chart the time medication was given due to it not always being noted whether it was a.m. or p.m. and agreed that it should be clear. Thompson said that if an entry is made later, it is to be noted "late entry." Thompson identified the entry "broken vials" as being written by Riggs and having her signature. Thompson testified she never broke any Demerol ampoules and never saw any broken except the day Davis died. Thompson said she only broke an ampoule unintentionally once when she dropped it on the floor and never saw anyone accidentally break an ampoule of Demerol.

Thompson stated "no" when asked if the "wee hours of the night" when Riggs was medicating Davis were Riggs' routine working hours. Shirley Harris testified Riggs' expected hours would normally be 8:00 or 8:30 a.m. to 5:00 or 5:30 p.m., Monday through Friday. Thompson knew of no other patients Riggs was medicating during those hours. Thompson stated she disagreed with Riggs' drawing up two syringes to trap someone stealing drugs because that is not the proper way to handle Demerol. Thompson testified Riggs wasted the syringes but she did not see her do it, nor did she see her draw them up. Thompson said Laura Murray watched Riggs waste them but since Murray had not seen Riggs draw them up, Thompson told Murray "not to write that it was Demerol that was being wasted because she had no idea what it was being wasted." Thompson testified the date the syringes were drawn up appeared to be June 2, and by that time, there was suspicion in the nursing home that Demerol was missing.

Brenda Wilmore testified she found in Davis' chart a lot of places where dates and time had been changed and written over. Wilmore testified the correct procedure is to mark one line through the incorrect entry, note it as "error" or "mistaken entry" and then chart the correct entry but this was not the procedure followed in charting Davis' medication. Wilmore noted some of the entries were not sequential in date or number. Wilmore stated there were a lot of ampoules charted as broken. Wilmore testified in her experience Demerol ampoules of the type prescribed for Davis were not "very, very fragile." Wilmore agreed she should have been able to determine the number of broken ampoules from the chart but testified she could not determine the exact number from the chart Wilmore testified Riggs' explanation for drawing up the two syringes of Demerol to see if it would be counted did not make sense.

Wilmore had never in her career seen a director of nurses involved in administering medication. Wilmore testified it was highly unusual for the director of nurses to have spent so much time with one single patient and for there to be so many entries in the narcotics record that she administered medication. Wilmore said Riggs' name was on there predominantly from the time Demerol was ordered. Prior to when Demerol was ordered, only two entries were made by Riggs.

Wilmore testified the records showed Davis was receiving other medications, such as Percocet, Restoril, and Temazepam, but she did not remember seeing Riggs' name on any other medication chart after May 21, 1994, when Demerol was first ordered. Wilmore found it highly unusual that Riggs would ask Peggy Bowie to leave the room when Riggs came in to give Davis a shot of Demerol. The depositions of Deborah Brantley and Rene Thompson provided that their schedules were rearranged when Riggs was hired so she would not have to work weekends but Davis' chart contained a number of entries by Riggs' indicating administration of Demerol on Saturdays and Sundays.

Wilmore testified the mischarting and discrepancies in charting affords a nurse an opportunity to divert medication and that the chart did not account for all the Demerol. Wilmore stated she was not absolutely positive Riggs administered all of the medication she signed out.

June Fournet testified her father would call her and complain "They won't give me my shots" and "I'm not getting any shots." She stated that Davis complained many times about not getting his pain medication and recounted one visit when she saw him receive his shot and asked, " 'Daddy, how come you're doing so good today? I mean you got the shot, you know, you're doing great.' I said, 'How come when you get your other shots, you call and you say you're in pain and everything else?' He goes, 'What shots? I don't get shots all the time.' " Dan Davis testified he informed Dr. Potvin his father was not receiving his pain medication and that Davis was complaining to him constantly that he was not getting his pain medication.

Deborah Brantley testified when Riggs came to work at Gulf Health she and Rene Thompson had to each work one day on the weekend because Riggs did not want to work

weekends. Brantley testified she had never unintentionally broken any vials of Demerol. Brantley believed Riggs' drawing up the two syringes violated every nursing procedure she knew of. She said no nurse should have administered that medication since they did not draw it up. Brantley was told the purpose of drawing those syringes was to trap somebody. Brantley further testified that to her knowledge Riggs did not provide any nursing care to the other patient in Davis' room. Brantley found the charting of Davis' Demerol unacceptable.

An entry on Davis' treatment sheet for June 6, 1994, stated that Riggs treated his decubitus ulcer at 4:00 p.m. that day. However, Thompson testified he was deceased at that time (time of death was noted as 4:00 p.m.) and would not have received such care. Riggs testified she was not at the nursing home when Davis died on June 6, 1994, but then acknowledged she had an entry on the treatment sheet for decubitus care at 4:00 p.m. Thompson could not explain that entry or an entry for support stockings dated June 7. Thompson agreed it was not a reliable record that any of the treatment represented to have been given was in fact given. She further agreed it made her question all the treatment logged on the treatment sheet.

Though the evidence is circumstantial, I believe the jury's conclusion that Riggs diverted Davis' Demerol is an inference supported by more than a scintilla of evidence. This evidence, as set forth in abundant detail, is not meager and is not mere surmise or suspicion. *See Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d at 936. While an "opposite inference" may be drawn, such an inference would not be *equally* plausible. *Id.* Clearly, upon consideration of *all* the circumstances, only one factual scenario is consistent with the evidence—that Riggs did divert Davis' medication. I would overrule Gulf Health Care's second point of error and affirm the judgment of the trial court.