NUMBER 13-02-171-CV

 

                         COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI - EDINBURG 

 

FRANCISCA
ESCOTO, ET AL.,                                                    
Appellants,

 

                                                             v.

 

THE
ESTATE OF ROBERT

AMBRIZ,
ET AL.,                                                                            Appellees.

 

      On appeal
from the 197th District Court of Willacy County, Texas.

 

                                             OPINION

 

                          Before
Justices Yañez, Castillo, and Garza

                                        Opinion
by Justice Yañez              

 








Following the deaths of four motorists involved in
an auto accident with a Nabors Drilling employee (ANabors@), Robert Ambriz, appellants[1]
asserted wrongful death actions against Nabors. 
A Willacy County jury returned a verdict in favor of appellants.  However, 
the trial court granted Nabor=s motion for judgment notwithstanding the verdict (AJNOV@).  Appellants
appeal the JNOV.  We reverse and remand.

Background

On March 17, 1998, Mr. Ambriz was driving home on
Highway 490 after completing a twelve-hour graveyard shift at a Nabors= oil and gas drilling site.  As Ambriz drove home, Ambrizs= vehicle improperly crossed the highway median and
collided head-on with a vehicle driven by Martin Rodriguez and occupied by
Leovarda Torres, Roberto Escoto, and Jose Gutierrez.  The collision resulted in the deaths of all
motorists.  Appellants filed suit against
Nabors and the estate of Mr. Ambriz,[2]
asserting numerous causes of action for negligence, gross negligence,
negligence per se, and wrongful death. 
After a trial on the merits, the jury returned a verdict in appellants= favor. 
Nabors filed a JNOV, which the trial court granted on February 19, 2002.


Issues on Appeal

In three issues, appellants contend JNOV was
improper because (1) Nabors owed a legal duty to appellants, (2) evidence
presented at trial was legally and factually sufficient to support Rodriguezes= capacity to assert wrongful death claims, and (3)
the evidence was legally and factually sufficient to support the damages
awarded for the conscious pain and suffering of Leovarda Torres.








By two cross-points, Nabors argues that if this
Court reverses the trial court=s JNOV, it is entitled to a new trial because (1)
the evidence is factually insufficient to support the findings on six jury
questions, and (2) the court committed charge error. 

Standard of Review

A motion for JNOV should be granted when the
evidence is conclusive and one party is entitled to recover as a matter of law
or when a legal principle precludes recovery.[3]
A trial court may disregard a jury's verdict and render judgment
notwithstanding the verdict if no evidence supports the jury's findings or if a
directed verdict would have been proper.[4]  To determine whether the trial court erred in
rendering a JNOV, we consider only the evidence, and reasonable inferences from
that evidence that tend to support the jury's answers.[5]  In other words, we view the evidence in the
light most favorable to the verdict under the well‑settled standards that
govern "no evidence," i.e., legal‑sufficiency review.[6]  In reviewing the legal sufficiency of the
evidence, we view the evidence in the light favorable to the verdict, crediting
favorable evidence if reasonable jurors could, and disregarding contrary
evidence unless reasonable jurors could not.[7]








A no evidence challenge is proper when the rules of
law or evidence preclude according weight to the only evidence offered to prove
a vital fact.[8]  If the controlling law permits the vital
fact, and more than a scintilla of competent evidence supports the jury's
findings, this Court will reverse the JNOV.[9]  More than a scintilla arises when the
evidence supporting the finding, as a whole, rises to a level that would enable
reasonable and fair‑minded people to differ in their conclusions.[10]  Evidence that gives rise only to mere surmise
or suspicion of the existence of a vital, material factual element is not more
than a scintilla and, therefore, no evidence of the vital, material factual
element to be inferred.[11]


An assertion that the evidence is insufficient to
support a fact finding means that the evidence supporting the finding is so
weak or the evidence to the contrary is so overwhelming that the answer should
be set aside and a new trial ordered.[12]  We consider all of the evidence in the case
in making this determination.[13]


Applicable Law

A cause of action for negligence requires three
elements.[14]  There must be (1) a legal duty owed by one
person to another, (2) a breach of that duty, and (3) damages proximately
caused by the breach.[15]









            In
their first issue, appellants contend Nabors owed  them a legal duty because it (1) caused its
employee, Ambriz, to become incapacitated, creating a foreseeable risk of harm,
and (2) had a duty to adequately train Ambriz regarding the dangers of
fatigue.  Appellants further argue that
Nabors breached its duty in failing to act as a reasonably prudent employer in
the same or similar circumstances.

Duty is a threshold inquiry in a negligence action.[16]  The existence of a legal duty is a question
of law for the court to decide from the particular facts surrounding the
occurrence in question.[17]  We review the trial court's determination of
duty on a de novo basis.[18]


  The question
of legal duty is a multifaceted issue requiring us to balance a number of
factors, such as the risk and foreseeability of injury, the social utility of
the actor's conduct, the consequences of imposing the burden on the actor, and
any other relevant competing individual and social interests implicated by the
facts of the case.[19]  Although the formulation and emphasis varies
with the facts of each case, three categories of factors have emerged (1) the
relationship between the parties, (2) the reasonable foreseeability of harm to
the person injured, and (3) public policy considerations.[20]









Generally, a person does not have a duty to control
the conduct of an another.[21]  However, in Otis Eng=g Corp. v. Clark,[22]
the Texas Supreme Court considered, inter alia, whether an employer
had a duty to prevent off-duty employees from causing an unreasonable risk of
harm to others.[23]  In Otis, the plaintiffs asserted
wrongful death claims against Otis after their wives were killed in an
automobile accident caused by Otis=s off-duty employee, Robert Matheson, who had left
the Otis job site in an intoxicated state.[24]  In deciding the duty issue, the court focused
on two factors: (1) the employer=s knowledge concerning the employee=s incapacity, and (2) the extent of control exerted
by the employer over its employee.[25]

Regarding employer knowledge, the supreme court
noted that several Otis employees informed their supervisor that AMatheson was not acting right.@[26]  The
supervisor also acknowledged he was made aware of Matheson=s condition, and that he personally observed his
condition.[27]  The court concluded that Matheson=s Aextreme state of intoxication was well known to his
supervisor and fellow workers,@ and that Matheson=s
supervisor Aknew [he] was in no condition to drive home safely
that night.@[28]  








With respect to control, Otis contended on appeal
that, at worst, its conduct amounted to nonfeasance.[29]  However, the supreme court noted that despite
Matheson=s intoxication, his supervisor Asuggested [to Matheson] that he . . . go home,@ escorted Matheson to the company=s parking lot, and allowed him to drive home.  In light of these circumstances, the court
concluded Otis=s conduct rose to such a level that it exercised
affirmative acts of control over its employee.[30]  The court held that Awhen, because of an employee's incapacity, an
employer exercises control over the employee, the employer has a duty to take
such action as a reasonably prudent employer under the same or similar
circumstances would take to prevent the employee from causing an unreasonable
risk of harm to others.@[31] 
Nevertheless, the court noted that Athe duty of the employer or one who can exercise
charge over a dangerous person is not an absolute duty to insure safety, but
requires only reasonable care."[32]   








Since Otis,[33]
Texas courts have shown an unwillingness to expand the duty to include
situations where the employer either had no knowledge of the employee's
condition or did not affirmatively exercise control over the employee.[34]  Nevertheless, a duty may exist because of an
employer=s negligent exercise of control over its employee.[35]  








In Duge v. Union Pacific R.R. Company, a long‑time
railroad employee, Marcelino Garcia, worked a Aregular
work day@ and then worked all night at a train derailment.[36]  After being on the job for a total of
twenty-seven hours, Garcia concluded his work at the derailment site, and was
dropped off by his supervisor at Union Pacific=s
parking lot where his truck was parked.[37]  As Garcia traveled home, a witness observed
his truck strike the rear of Edward Duge=s truck, causing Mr. Duge=s death.[38]  As a result, Mr. Duge=s wife and son brought a negligence suit against
Union Pacific, claiming it was liable for the death because it knew of Garcia=s incapacity due to fatigue, but nonetheless placed
him on the highway to the foreseeable peril of other travelers.[39]  Union Pacific filed a motion for summary
judgment, arguing that no genuine issue of material fact existed concerning
whether Union Pacific Aaffirmatively exercised control over Garcia.@[40]  After
considering the motion, the trial court granted summary judgment in Union
Pacific=s favor.[41]  On appeal, at issue was whether Union Pacific
owed a duty to the Duges.[42]  Summary judgment evidence showed that Garcia
did not appear incapacitated prior to leaving Union Pacific=s premises, and that during Garcia=s fifty-mile commute home, he stopped for fuel,
where he visited with a friend for an hour to an hour and a half.[43]  Based on the facts, this Court concluded that
the trial court=s grant of summary judgment was proper and declined
to impose a duty on Union Pacific because no genuine issues of material fact
existed to support that Union Pacific had knowledge or exercised control over
its employee.[44]

In this case, however, the facts are distinguishable
from Duge.  Unlike Duge,
the record in this case is replete with evidence that Nabors (1) had knowledge
concerning the unreasonable risk of harm caused by fatigue, (2) negligently
exercised control over its employee, Robert Ambriz, and (3) failed to
adequately train Ambriz.

Regarding knowledge, Michael Stephens, Nabors= Health, Safety, and Environmental Manager for the
United States, testified that he was aware of the potential dangers of jobs in
drilling operations.  Stephens
nonetheless acknowledged that Nabors did not have a training program that
specifically addressed the potential dangers caused by fatigue.  With respect to the shift preceding the fatal
accident, evidence conflicted regarding the extent of fatigue of Ambriz and his
fellow crew workers.  However, the last
person who observed Ambriz leave the job site was his co-worker, Larry Denning,
who was the motorman on the drilling rig. 
According to Denning, the crew was in a rush to complete a repair to the
rig.  Denning claimed that as a result,
the work on that shift was particularly exhausting.  When questioned regarding his personal
observations as to whether Ambriz appeared fatigued, he stated that on the
shift in question, Awe were all tired.@ 








With respect to control, Stephens testified that
Nabors required its employees to work twelve-hour graveyard shifts[45]
for one week straight, followed by a week of twelve-hour day shifts, taking a
week off in between.  He acknowledged
that other petrochemical companies utilized eight-hour shifts.  Stephens also testified that Nabors did not
enforce a mandatory break policy, setting the frequency as to when breaks
should occur.  Stephens stated that if Asomebody needs a break, they take a break.@  Stephens
confirmed that Nabors had a written AFit For Duty@ safety policy. 
According to the policy, prior to every shift, tool pushers and drillers
were required to Aphysically observe each individual . . . scheduled
for duty...to assess that each individual is fit for workBthat is, not sleepy, hung over, sick.@  Stephens
further testified that under the policy, a designated safety captain, tool
pusher, or driller was responsible for executing the fit-for-duty policy.  Stephens also stated that Nabors had a
program that Atrained employees to recognize unsafe conditions
within their workplace and to take personal action to help eliminate the unsafe
. . . condition.@ 








On the shift preceding the accident, despite company
policy requiring the designation of a safety captain, it was unclear who, if
anyone, was assigned to this role. 
Bertaldo Diaz, the toolpusher who worked the night shift with Ambriz,
testified that under Nabors=s safety policy, any worker had the right to prevent
an employee from working if the employee was unfit for duty.  Nevertheless, Diaz testified that fatigue
management was not discussed during the night shift in question and he did not
know who was designated as the safety captain. 
Celestino Balderas, a derrickman who also worked that night, testified
that it was the responsibility of the driller or tool pusher to supervise
workers.  However, on the night shift in
question, Balderas stated that he did not Ahave the time@ to tell Ambriz to be careful on the way home.  He further testified that Nabors never held
any meetings concerning the dangers of fatigue. 
After a careful review of the record, under these particular
circumstances, we conclude that Nabors had a duty because it was aware of the
dangers of fatigue, knew of Ambriz=s fatigue prior to the accident in question, but
nonetheless permitted him to drive home to the foreseeable peril of himself and
others.[46]   We further conclude that evidence supports
that Nabors breached its duty by failing to act as a reasonably prudent
employer in same or similar circumstances.[47]

Appellants next contend the evidence is sufficient
to support causation.  In contrast,
Nabors argues that in the event this Court imposes a duty, and subsequently
reaches the merits as to causation, the trial court abused its discretion in
refusing to exclude appellants= expert=s opinion that Ambriz=s
fatigued condition caused the accident.  
Nabors argues Dr. Schiflett=s testimony concerning causation should have been
struck because (1) it was based only on subjective observation, (2) was not
subjected to peer review, and (3) was unsupported by underlying data.  Nabors also argues that there was no evidence
of causation.  We first address the
admissibility of the testimony of appellants=
expert, Dr. Samuel Schiflett. 








For an expert's opinion testimony to be admissible,
the expert must be qualified, the expert's opinion must be relevant to the
issues in the case, and the expert's opinion must be based upon a reliable
foundation.[48]  The trial court has broad discretion in this
area.[49]  It is settled in Texas that a trial court's
ruling on the admissibility of evidence will not amount to reversible error
unless the error probably led to the rendition of an improper judgment.[50]
   








Dr. Schiflett holds masters and doctorate degrees in
experimental psychology, as well as two minors in physiology and human factors
engineering.  He testified that he worked
for the Navy for nine years, and that he was employed with the United States
Air Force for fifteen years in operations that focused on the effects of
fatigue.  Dr. Schiflett served on various
panels in the Air Force, conducted research, and facilitated group studies, all
focusing on the effects of fatigue in people. 
In one experiment developed by Dr. Schiflett, and tested and relied on
by the National Aeronautics Space Agency on the Columbia Space Shuttle Project,
the study focused on the effect of shift-worker[51]
fatigue on an individual=s circadian rhythm.[52]  Dr. Schiflett also testified that his theory
concerning shift-worker fatigue and causation was based on research collected
over the past sixty years, in particular review articles, such as reports
issued by the National Highway Traffic Safety Administration.  Dr. Schiflett testified that Amicrosleeps,@ which he described as temporary periods of sleep,
commonly occur in fatigued individuals without their knowledge.  Based on his qualifications, research, group
studies, and analysis of the facts of this case, Dr. Schiflett opined that
Ambriz=s fatigue caused the accident in question.  Dr. Schiflett=s
testimony concerning his qualifications, group studies, and research exceed the
level of speculation and subjective observation.[53]   Accordingly, we conclude the trial court did
not abuse its discretion in admitting Dr. Schiflett=s testimony.[54]

We now address the sufficiency of the evidence
regarding causation.  

To evaluate the legal sufficiency of the evidence to
support a finding, we must "determine whether the proffered evidence as a
whole rises to a level that would enable reasonable and fair‑minded
people to differ in their conclusions."[55]

To evaluate the factual sufficiency of the evidence
to support a finding, we consider all the evidence and will set aside the
verdict only if the evidence supporting the jury finding is so weak that the
finding is clearly wrong and unjust.[56]  This Court, however, is not a fact finder; we
may not pass upon the credibility of the witnesses or substitute our judgment
for that of the trier of fact, even if a different answer could be reached upon
review of the evidence.[57]









Proximate cause requires both cause-in-fact and
foreseeability.[58]  The test for cause-in-fact is whether the act
or omission was a substantial factor in causing the injury without which the
harm would not have occurred.[59]  Foreseeability exists when "the actor as
a person of ordinary intelligence should have anticipated the dangers his
negligent act creates for others."[60]  The foreseeability element only requires that
the general danger be foreseeable, not the precise sequence of events that
produced the harm.[61]  Proximate cause may be proven by either
direct or circumstantial evidence, but it cannot be based upon conjecture,
guess, or speculation.[62]









Testifying experts disagreed regarding whether
Ambriz was fatigued, and concerning whether fatigue caused the accident in
question.     Nevertheless, evidence
showed that other companies utilized an eight-hour shift schedule.  However, Nabors required its employees to
work twelve-hour shifts as a condition of employment.  Nabors also required its oil drilling rigs to
operate around the clock, with limited downtime allowed only for repair
work.  Several Nabors employees testified
that fatigue was common in the oil industry because of the intense physical
nature of their jobs.  Nabors=s safety manager, Stephens, testified that Nabors
had no formal policy establishing the time that employees should take breaks,
nor did it have a training policy regarding the dangers attributable to
fatigue.  It was undisputed that Ambriz
had no prior oil field experience, and that he had been employed for less than
a year.   

Officer Andres Maldonado, a Texas Department of
Public Safety (ADPS@) officer in charge of the investigation, testified
that he had nearly fourteen years of experience, and that he was the instructor
at the DPS Academy on accident reconstruction. 
Prior to the accident, uncontradicted eyewitness reports established
that Ambriz=s vehicle was weaving.  However, the DPS investigation revealed that
neither alcohol or external distractions were a factor in the accident, and
that Ambriz caused the accident in question. 
Officer Maldonado stated that he Astopped several vehicles in the past who [he had]
thought to be drunk drivers, [but] were not, they were just tired, weaving on
the roadway.@  He further
testified that the skid length of Ambriz=s vehicle was very short, indicating that Ambriz had
taken brief, evasive action immediately prior to the collision.  Finally, he testified that based on his
investigation, fatigue was a factor in the accident. 








After reviewing this record, we hold that the
evidence is legally and factually sufficient to support causation.[63]  Evidence supports that Nabors= negligence was the cause-inBfact of the deaths in that its negligent conduct was
a substantial factor in causing the accident.[64]  We recognize that cause-in-fact is not shown
if a defendant=s negligence merely provided a condition that made
the accident possible.[65]  However, under these factual circumstances,
we conclude Nabors provided much more than a condition, as its conduct was
instrumental in causing the fatigue, and the subsequent accident in question.[66]  As such, it could have anticipated the danger
created by its negligent conduct.[67]  We therefore conclude a rational juror could
have found that Nabors=s conduct proximately caused the accident and the
four deaths in question.[68]  We further conclude that proof of causation
is not so weak and the evidence to the contrary is not so overwhelming that the
jury=s verdict should be set aside and a new trial
ordered.[69]  Appellants first issue is
sustained.  

        In
their second issue, appellants contend the evidence is legally and factually
insufficient to support that Martin=s wife, Dora, and his four children had the proper
authority to assert wrongful death claims.  At trial, however, appellees argued that
Martin and Dora=s marital status was unclear.  

In this case, the jury viewed several photos of the
Rodriguez family, including photos of Martin and Dora at their marriage ceremony.  Several witnesses, including Francisca
Escoto, also confirmed that the couple was married and had four children.  It should also be noted that the evidence to
the contrary is negligible.  After
reviewing the record, we conclude the evidence is legally and factually
sufficient to support that Martin and Dora were married with four children.[70]  As such, they had the proper authority to
assert the wrongful death claims at issue.[71]









In a third issue, appellants contend the evidence is
legally and factually sufficient to support the jury=s award of $5000 for the conscious pain and
suffering of Leovarda Torres prior to her death. 

As a general rule, the jury has the broad discretion
to award damages within the range of evidence presented at trial, so long as a
rational basis exists for its calculation.[72]  The jury must engage in an honest endeavor to
ascertain damages sustained in light of the attendant facts and conditions.[73]









It is within the province of the jury's discretion
to determine the dollar amount of a plaintiff's pain and suffering.[74]  Because there are no objective guidelines to
assess the monetary equivalent of pain and suffering resulting from physical
injury, the trier of fact is given considerable discretion in awarding amounts
appropriate for such damages.[75]  The process of awarding damages for
amorphous, discretionary injuries such as pain and suffering is inherently
difficult because the alleged injury is a subjective, unliquidated,
nonpecuniary loss.[76]  Even where there is no direct evidence of
pain, the factfinder may infer pain from the nature of the injury.[77]  Pain and suffering may be inferred or
presumed as a consequence of severe injuries.[78]


Officer Andres Maldonado testified that he arrived
at the scene shortly after the accident. 
According to Officer Maldonado, the investigation revealed that Ambriz=s vehicle had veered into Athe wrong side of the roadway@ while traveling at approximately sixty-eight miles
per hour.  Officer Maldonado confirmed
through eyewitness interviews that Leovarda was gasping for air shortly after
the collision.  The record shows that the
head-on collision resulted in the deaths of all five individuals in both
vehicles.  The accident also resulted in
multiple fractures in Leovarda=s right arm and both legs, severely crushed her
chest, and nearly severed her left index finger.  Under these circumstances, we conclude the
evidence taken as a whole is both legally and factually sufficient to support
the jury=s award of $5000.[79]  

Nabors=s Cross-points

In its first cross-point, Nabors contends that in
the event the trial court=s JNOV is reversed, it is entitled to a new trial
because the evidence is factually insufficient to support the jury=s answer to six questionsCQuestions 1, 2, 7(a), 8(a), 9(a), and 13(a).  However, Nabors has failed to cite to either
appropriate legal authority and to appropriate portions of the record to
support its factual sufficiency challenge.[80]  Nabors has therefore waived this issue on
appeal.  We overrule Nabors=s first cross-point.








In Nabors=s second cross-point, it contends that in the event
the court=s JNOV is reversed, it is entitled to a new trial
because the court submitted improper questions and instructions in questions
one and two of the jury charge.  Nabors
argues specifically that the court (a) should have submitted a separate
question on control, (b) improperly instructed the jury on the appropriate
standards of care for negligence, and (c) should have submitted appellants= two negligence theories in a single,
broad-form question format.

Standard of Review‑Charge Error

Our review of the trial court's submission is under
an abuse of discretion standard.[81]  The trial court has broad discretion in
submitting jury questions as long as the submission fairly places the disputed
issues before the jury.[82]  A trial court is afforded more discretion
when submitting instructions than when submitting questions.[83]  To determine if the failure to submit a
requested instruction is error, we must consider the pleadings, trial evidence,
and the entire charge.[84]  An error will be deemed reversible only if,
when viewed in the light of the totality of the circumstances, it amounted to
such a denial of the rights of the complaining party as was reasonably
calculated to and probably did cause the rendition of an improper judgment.[85]   

Applicable Law








Rule 277 of the Texas Rules of Civil Procedure
requires the use of broad‑form questions be used whenever feasible.[86]  However, broad‑form submission does not
entail omitting elements of proof from the charge.[87]  The trial court must submit instructions as
shall be proper to enable the jury to render a verdict.[88]  Nevertheless, a trial court can generally
inquire about separate issues of negligence in a single question with proper
instructions.[89]  Additionally, controlling issues may be
submitted by questions, instructions, definitions, or a combination thereof.[90]


Generally, a cause of action for negligence in Texas
requires three elements.[91]  There must be a legal duty owed by one person
to another, a breach of that duty, and damages proximately caused by the
breach.[92]  Proximate cause requires both cause-in-fact
and foreseeability.[93]  Foreseeability exists when "the actor as
a person of ordinary intelligence should have anticipated the dangers his
negligent act creates for others."[94]









An employer has a duty to adequately hire, train,
and supervise employees.[95]  A cause of action for negligent supervision
is based on an employer's direct negligence.[96]  Under the tort of negligent supervision, a
negligent employer may be directly liable to a third party whose injury was
proximately caused by the employee's negligent or intentional act.[97]


The Charge

In this case, appellants= claims of negligence were based on two different
theoriesBa general negligence theory and a more specific
theory of a negligent failure to train and supervise.  The court submitted the following definitions
to the jury:

ANegligence,@[98] when used with respect to the conduct of Nabors
Drilling USA, Inc., means failure to use ordinary care, that is, failing to do
that which a company of ordinary prudence would have done under the same or
similar circumstances or doing that which a company of ordinary prudence would
not have done under the same or similar circumstances.

 

AOrdinary Care,@[99] when used with respect to the conduct of Nabors . .
. means that degree of care that an employer of ordinary prudence would use
under the same or similar circumstances. 


 

In question one, the court submitted a single
question with instructions as follows:

QUESTION NO. 1:

Did the negligence, if any, of those named below,
proximately cause the occurrence in question?

 








You are instructed that in order to find Nabors
Drilling negligent, you must find:

 

1)         Roberto Ambriz was incapacitated,

2)         Nabors Drilling exercised control over
Roberto Ambriz,  and

3)         Nabors Drilling failed to act as a
reasonable and prudent employer under the same or similar circumstances would
in order to prevent an employee from causing an unreasonable risk of harm to third
persons.         

The jury answered AYes,@ finding Nabors and Ambriz liable for negligence,
but answered ANo,@ declining to impose liability on Martin Rodriguez.

In question two, the jury was asked the following:

Question No. 2

Was the negligence, if any, of Nabors Drilling in
failing to adequately train Roberto Ambriz a proximate cause of the occurrence
in question?

 

The jury answered AYes,@ holding Nabors liable for negligence in failing to
train Ambriz.

Analysis








We disagree with Nabors=s argument that a separate question on control was
required.  Although omission of the
entire element of control from the jury charge would have been error, question
one included a predicate instruction that a finding of control was necessary in
order to impose negligence liability, and a request for the jury to determine
whether Nabors was negligent.  Because
the question included a proper predicate instruction regarding control and
asked the jury to make a finding regarding control, we conclude the court did
not abuse its discretion in submitting the negligence issue in a single
question format.[100]    

Nabors further argues that the court should have
issued a predicate instruction in question one and two that in order for the
jury to hold Nabors liable, it had to find that Nabors Ahad knowledge of [its] employee=s incapacity.@  However, the
court instructed the jury that in order to find Nabors liable, it was required
to find that (1) Ambriz was incapacitated, (2) Nabors exercised control over
Ambriz, and (3) Nabors failed to act as a reasonable and prudent employer under
the same or similar circumstances. 
Additionally, knowledge was inherent in the charge to the jury, which
included a requirement of a predicate finding that Nabors exercised control over
Ambriz.  In light of the pleadings,
evidence, and charge, and for the reasons discussed above, we conclude it was
not reasonably necessary to include a specific instruction regarding knowledge.[101]  Accordingly, there was no abuse of
discretion, and even if there were an abuse of discretion, we would not be able
to conclude that it probably led to the rendition of an improper judgment.[102]









Finally, Nabors argues that the court should have
submitted both negligence theories in a single, broad-form submission.  However, submitting alternative liability
standards when the governing law is unsettled might very well be a situation
where broad‑form submission is not feasible.[103]  Similarly, when the trial court is unsure
whether it should submit a particular theory of liability, separating liability
theories best serves the policy of judicial economy underlying rule 277 by
avoiding the need for a new trial when the basis for liability cannot be
determined.[104]   

The record reflects that the court was uncertain
with respect to the governing law at the time the charge was submitted.  Additionally, the parties diverged with
respect to their interpretation of the law governing the facts of this
case.  Consequently, the trial court was
within his discretion in submitting each negligence theory separately.[105]  Having fully considered Nabors=s arguments regarding the court=s charge, we overrule its second cross-point.  

Conclusion

After a review of the entire record, we conclude the
trial court erred in granting a judgment notwithstanding the verdict in Nabors=s favor. 
Accordingly, we reverse the trial court=s
order, reinstate the jury=s verdict, and remand to the trial court to enter
judgment based on the jury=s verdict.

                                                      
                                                                                         LINDA
REYNA YAÑEZ,

Justice

 

 

Dissenting opinion by 

Justice Castillo.

 

Opinion delivered and filed


this the 8th day of June,
2006.











[1]  Francisca Escoto, individually and
as the surviving spouse and representative of the estates of Jose Gutierrez and
Roberto Escoto, Dora Rodriguez, individually and as the surviving spouse and
representative of the estate of Martin Rodriguez and as next of friend of
minors, Uvaldo Rodriguez, Isabel Rodriguez, Patricia Rodriguez and Elizabeth
Rodriguez, and Noelia Torres, individually and as representative of the estate
of Leovarda Torres and as next of friend of minor, Yazmin Torres. 





[2]  All claims against the estate were
settled prior to trial.  





[3] 
Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 227 (Tex. 1990).  





[4]  See Tiller v. McLure, 121 S.W.3d 709, 713 (Tex. 2003); Brown
v. Bank of Galveston, 963 S.W.2d 511, 513 (Tex. 1998); Williams v.
Briscoe, 137 S.W.3d 120, 124 (Tex. App.BHouston [1st Dist.] 2004, no pet.).  





[5] 
See Tiller,
121 S.W.3d at 713; Williams, 137 S.W.3d at 124.  





[6]  See Wal‑Mart Stores, Inc. v. Miller,
102 S.W.3d 706, 709 (Tex. 1992); Williams, 137 S.W.3d at 124. 





[7]  City of Keller v. Wilson, 168 S.W.3d 802, 807 (Tex.
2005).          





[8]  See Merrell Dow Pharms., Inc. v.
Havner, 953 S.W.2d
706, 711 (Tex. 1997).  





[9] 
See Miller, 102 S.W.3d at 709; Williams, 137 S.W.3d at 124.  





[10] 
See Williams, 137 S.W.3d at 124 (citing Burroughs Wellcome Co.
v. Crye, 907 S.W.2d 497, 499 (Tex. 1995)). 






[11]  See Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex.
2004).  





[12]  See Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.
1965).  





[13] 
See Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 406‑07 (Tex. 1998).





[14] 
See D. Houston, Inc. v. Love, 92 S.W.3d 450, 454 (Tex. 2002).  





[15] 
See id. (citing El Chico Corp. v. Poole, 732 S.W.2d 306,
311 (Tex. 1987)).            





[16] 
See Thapar v. Zezulka, 994 S.W.2d 635, 637 (Tex. 1999); Centeq Realty, Inc.
v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995).  





[17] 
See Van Horn v. Chambers, 970 S.W.2d 542, 544 (Tex. 1998); City of McAllen v. De
La Garza, 898 S.W.2d 809, 810 (Tex. 1995). 






[18] 
See El Paso Natural Gas Co. v. Minco Oil & Gas, Inc., 8
S.W.3d 309, 312 (Tex. 1999).





[19] 
See Otis Eng'g Corp. v. Clark, 668 S.W.2d 307, 309 (Tex. 1983); see also 1 J.
Hadley Edgar, Jr. & James B. Sales, Texas
Torts and Remedies 1.03[2][b] (2000). 






[20] 
See Graff v. Beard, 858 S.W.2d 918, 919 (Tex. 1993); Greater Houston Transp. Co. v.
Phillips, 801 S.W.2d 523, 525 (Tex. 1990). 





[21] 
See Graff,
858 S.W.2d at 920.  





[22]  Otis Eng'g Corp., 668 S.W.2d at 308-19.





[23] 
See id. at 308.





[24]  Id.                      





[25] 
Id. at
309-11.





[26]  Id. at 308.





[27] 
Id.





[28] 
Id.





[29] 
Id. at 309.





[30]  Id. at 309-10.





[31] 
See id. at 311 (citing Restatement (Second) of Torts ' 319 (1965)).  





[32] 
Id.





[33]  See Otis Eng'g Corp., 668 S.W.2d 307.





[34] 
See Greater Houston Transp. Co., 801 S.W.2d at 526‑27; Estate
of Catlin v. Gen. Motors Corp., 936 S.W.2d 447, 451 (Tex.App.BHouston [14th Dist.] 1996, no
writ); DeLuna v. Guynes Printing Co. of Texas, Inc., 884 S.W.2d 206, 210
(Tex.App.BEl Paso 1994, writ denied) (finding
that in order for a duty to arise, the employer must not only have some
knowledge of the employee's condition or incapacity, but must exercise some
control or perform some affirmative act of control over the employee).  





[35] 
See Greater Houst. Transp., 801 S.W.2d at 526 (emphasis added). 





[36] 
See Duge v. Union Pac. R.R. Co., 71 S.W.3d 358, 360 (Tex. App.BCorpus Christi 2001, pet. denied).





[37]  Id.





[38]  Id.





[39] 
Id.





[40]  Id.





[41]  Id.





[42]  Id. at 361.





[43]  Id. at 360.





[44] 
Id. at 362-63.





[45]  The record reflects that the
graveyard shift is from 6:00 p.m. to 6:00 a.m., and the day shift is from 6:00
a.m. to 6:00 p.m.  





[46]  See Otis Eng'g Corp., 668 S.W.2d at 309-310; D.
Houston, Inc., 92 S.W.3d at 456.





[47]  See Otis Eng'g Corp., 668 S.W.2d at 309-310; D.
Houston, Inc., 92 S.W.3d at 456.





[48] 
Exxon Pipeline Co. v. Zwahr, 88 S.W.3d 623, 628-29 (Tex. 2002)
(citing Tex. R. Evid. 702;
Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 720 (Tex. 1998); E.I.
du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex.
1995)).  





[49] 
Exxon Pipeline Co., 88 S.W.3d at 629.  





[50]  Tex. R.
App. P. 41.1(a); McCraw
v. Maris, 828 S.W.2d 756, 758 (Tex. 1992). 





[51] 
The study was conducted on individuals who worked twelve-hour
shifts.  





[52] 
Generally, circadian rhythm refers to a person=s sleeping pattern.





[53] 
Exxon Pipeline Co., 88 S.W.3d at 628-29 (citing Tex. R. Evid. 702; Gammill, 972
S.W.2d at 720; E.I. du Pont de Nemours & Co., 923 S.W.2d at
556.  





[54]  Exxon Pipeline Co., 88 S.W.3d at 628-29 (citing Tex. R. Evid. 702; Gammill, 972
S.W.2d at 720; E.I. du Pont de Nemours & Co., 923 S.W.2d at
556).  





[55] 
Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994); see also St. Joseph
Hosp. v. Wolff, 94 S.W.3d 513, 519 (Tex. 2002) (plurality op.). 





[56] 
See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Dyson v. Olin Corp., 692
S.W.2d 456, 457 (Tex. 1985).  





[57] 
See Clancy v. Zale Corp., 705 S.W.2d 820, 826 (Tex. App._Dallas 1986, writ ref'd n.r.e.).





[58] 
See id. (citing
Farley v. M M Cattle Co., 529 S.W.2d 751, 755 (Tex. 1975)).  





[59]  Marathon Corp. v. Pitzner,
106 S.W.3d 724, 727 (Tex. 2003).  





[60] 
See id.
(citing El Chico Corp., 732 S.W.2d at 313).  





[61] 
Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 785 (Tex. 2001).  





[62] 
Marathon Corp., 106 S.W.3d at 727.





[63]  Moriel, 879 S.W.2d at 25; Cain,
709 S.W.2d at 176. 





[64]  Marathon Corp., 106 S.W.3d at 727; Moriel,
879 S.W.2d at 25; Cain, 709 S.W.2d at 176. 





[65]  See Doe v. Boys Clubs of Greater
Dallas, Inc., 907
S.W.2d 472, 477 (Tex. 1995). 





[66]  Marathon Corp., 106 S.W.3d at 727; Moriel,
879 S.W.2d at 25; Cain, 709 S.W.2d at 176. 





[67]  Marathon Corp., 106 S.W.3d at 727; Lee Lewis
Constr., Inc., 70 S.W.3d at  785.  





[68]  Clancy, 705 S.W.2d at 826.





[69] 
See Cain,
709 S.W.2d at 176; Dyson, 692 S.W.2d at 457.  





[70]  See Moriel, 879 S.W.2d at 25; St. Joseph
Hosp., 94 S.W.3d at 519; Cain, 709 S.W.2d at 176.  





[71] 
See Moriel,
879 S.W.2d at 25; St. Joseph Hosp., 94 S.W.3d at 519; Cain, 709
S.W.2d at 176.





[72] 
See Mayberry v. Texas Dep't of Agric., 948 S.W.2d 312, 317 (Tex. App.BAustin 1997, writ denied).  





[73] 
See Gen. Motors Corp. v. Grizzle, 642 S.W.2d 837, 845 (Tex. App.BWaco 1982, writ dism'd).





[74] 
Lege v. Jones, 919 S.W.2d 870, 877 (Tex. App._Houston [14th Dist.] 1996, no writ).  





[75] 
See Texarkana Mem'l Hosp., Inc. v. Murdock, 946 S.W.2d 836, 841 (Tex. 1997); Southwest
Texas Coors, Inc. v. Morales, 948 S.W.2d 948, 951 (Tex. App.BSan Antonio 1997, no pet.).  





[76]  See Tagle v. Galvan, 155 S.W.3d 510, 518 (Tex. App.BSan Antonio 2004, no pet.).  





[77]  See Prescott v. Kroger Co., 877 S.W.2d 373, 376 (Tex. App.BHouston [1st Dist.] 1994, writ
denied).  





[78] 
City of Austin v. Selter, 415 S.W.2d 489, 501 (Tex. Civ. App._Austin 1967, writ ref'd n.r.e.). 





[79] 
See Moriel, 879 S.W.2d at 25; Cain, 709 S.W.2d at 176; Prescott,
877 S.W.2d at 376; City of Austin, 415 S.W.2d at 501.





[80] 
See Tex. R. App. P.
38.1(h).  





[81]  European Crossroads' Shopping Ctr.,
Ltd. v. Criswell,
910 S.W.2d 45, 54 (Tex. App._Dallas 1995, writ denied).  





[82] 
Varme v. Gordon, 881 S.W.2d 877, 881 (Tex. App._Houston [14th Dist.] 1994, writ denied). 





[83] 
Wal‑Mart Stores, Inc. v. Middleton, 982 S.W.2d 468, 470 (Tex. App._San Antonio 1998, pet. denied).  





[84] 
See Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,
710 S.W.2d 551, 555 (Tex. 1986) (op. on reh'g). 






[85] 
See id.





[86] 
See Tex. R. Civ. P. 277.  





[87] 
Diamond Offshore Mgmt. Co. v. Guidry, 171 S.W.3d 840, 844 (Tex. 2005).  





[88] 
See Tex. R. Civ. P. 277.






[89] 
See id.  





[90] 
Tex. R. Civ. P. 278; Wright
Way Constr. Co. v. Harlingen Mall Co., 799 S.W.2d 415, 422 (Tex. App._Corpus Christi 1990, writ denied).





[91] 
See D. Love, 92 S.W.3d at 453. 






[92] 
See id. (citing
El Chico Corp., 732 S.W.2d at 311). 






[93] 
See id. (citing
Farley, 529 S.W.2d at 755).  





[94] 
See id. (citing
El Chico Corp., 732 S.W.2d at 313).





[95] 
Garcia v. Allen, 28 S.W.3d 587, 592 (Tex. App.BCorpus Christi 2000, pet. denied).  





[96]  Doe v. Boys Clubs of Greater Dallas, Inc.,
868 S.W.2d 942, 950 (Tex. App.BAmarillo 1994), aff'd, 907 S.W.2d 472 (Tex. 1995). 

 





[97] 
See Golden Spread Council, Inc. No. 562 of Boy Scouts of America v.
Akins, 926 S.W.2d 287, 294 (Tex. 1996).





[98]  Emphasis in original.





[99] 
Emphasis in original.





[100]  See Tex. R.
Civ. P. 277; Diamond
Offshore Mgmt. Co., 171 S.W.3d at 844; Varme, 881 S.W.2d at 881. 





[101]  Tex. R. Civ. P. 277; Diamond Offshore Mgmt. Co., 171 S.W.3d
at 844; Varme, 881 S.W.2d at 881. 





[102] 
See Tex. R. App. P. 44.1(a).





[103] 
Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 390  (Tex. 2000). 






[104] 
Id. 





[105] 
See id.