Benny FARLEY, a minor, by and through
his next friend, Charles
Ballman, Petitioner,

v.

M M CATTLE COMPANY, Respondent.

No. B–4972.

Supreme Court of Texas.

July 9, 1975.

Rehearing Denied Sept. 24, 1975.

Miller, Gann & Perdue, Ralph K. Miller and Jim M. Perdue, Houston, Edwards, Smith & Associates, Carson Smith, Fairweather, Hale & Dambold, Charles W. Fairweather, Amarillo, for petitioner.

Gibson, Ochsner, Adkins, Harlan & Hankins, A. B. Hankins, Kolander, Templeton & Hamilton, Robert L. Templeton, Amarillo, for respondent.

SAM D. JOHNSON, Justice.

This is a suit for damages for personal injuries sustained by Benny Farley when the horse he was riding collided with another horse ridden by a co-worker while they were in the process of rounding up cattle belonging to the M M Cattle Company. At the conclusion of plaintiff's evidence, the trial court entered a take-nothing judgment against Farley based upon defendant's motion for instructed verdict. The court of civil appeals affirmed. 515 S.W.2d 697. We reverse the judgment of the court of civil appeals and remand the case to the trial court.

On July 12, 1972 Benny Farley, Danny Beebe, James Guinn and Bunk Farley were rounding up calves from a pasture of the Bear Creek Ranch owned and operated by defendant M M Cattle Company. Bunk Farley is the father of Benny Farley and the foreman of the ranch. On the occasion in question, Danny Beebe and Benny Farley, on horseback, were engaged in moving about fifty calves when one of the calves broke away from the herd. Both Danny Beebe and Benny Farley rode after the calf to bring it back and in so doing the two cowboys ran their horses on either side of the running calf for the purpose of guiding it back to the herd. During this rapidly moving process, the horses of the two cowboys became headed in a direction which, if continued, would result in a collision. Upon discovering the impending peril, Danny Beebe reined his horse to the left away from Farley's horse. At almost the same instant Danny Beebe attempted to avoid the accident, Benny Farley's horse struck the side of Danny Beebe's horse. Benny Farley's horse fell to the ground and Danny Beebe's horse stumbled to its knees. Benny Farley was thrown off of his horse and suffered severe personal injuries.

Benny Farley alleged negligence on the part of M M Cattle Company in four respects: (1) in furnishing him a horse which was unsafe for the work which was to be done; (2) in instructing him to use the horse for rounding up cattle under such circumstances as to pose an unreasonable risk of harm to him; (3) in failing to properly supervise the operation; and (4) in failing to furnish him a horse which was suitable for the purpose for which the animal was intended to be used. Benny Farley further alleged that each of the above acts of negligence was a proximate cause of his injuries. In its answer M M Cattle Company pleaded among other things voluntary assumption of the risk, contributory negligence,[1] the fellow servant rule and the doctrine of parental immunity of the plaintiff's father which would allegedly protect M M Cattle Company as the father's employer.

Upon conclusion of the plaintiff's evidence, M M Cattle Company presented a motion for instructed verdict based upon its contention that the evidence submitted by the plaintiff failed to raise a fact issue regarding any of the alleged acts of negligence or proximate cause. The trial court granted the motion, withdrew the case from the jury and entered a take-nothing judgment in favor of defendant M M Cattle Company. The court of civil appeals affirmed, holding that even if there was negligence shown on the part of M M Cattle Company there was no evidence that such negligence was the proximate cause of Benny Farley's injuries.

Benny Farley brings ten points of error to this court. He contends first that the direct evidence admitted at trial was sufficient to raise issues of negligence and proximate cause for jury determination. He further claims that the trial court improperly

1. Since Benny Farley's cause of action arose before the effective date of Article 2212a, Vernon's Texas Revised Civil Statutes An-notated, comparative negligence is not involved in this appeal.

excluded admissible evidence which would bear on such issues and argues, alternatively, that this improperly excluded evidence, along with the evidence admitted by the trial court, would be sufficient to raise fact issues of negligence and proximate cause. We agree the direct evidence admitted at trial was sufficient to raise jury questions as to negligence and proximate cause and therefore find it unnecessary to consider his additional and alternative arguments. In reaching this determination we have of course reviewed the evidence in its most favorable light in support of the plaintiff's position. *Seideneck v. Cal Bayreuther Associates*, 451 S.W.2d 752 (Tex.1970); *Constant v. Howe*, 436 S.W.2d 115 (Tex.1968); *Fitz-Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256 (1951).

## NEGLIGENCE

■■■ It is well established that an employer has certain nondelegable and continuous duties to his employees. Among these are the duty to warn employees as to the hazards of their employment and to supervise their activities, the duty to furnish a reasonably safe place in which to labor and the duty to furnish reasonably safe instrumentalities with which employees are to work. *Leadon v. Kimbrough Brothers Lumber Company*, 484 S.W.2d 567 (Tex. 1972); *Fort Worth Elevators Co. v. Russell*, 123 Tex. 128, 70 S.W.2d 397 (1934); *Morton Salt Co. v. Wells*, 123 Tex. 151, 70 S.W.2d 409 (1934); *J. Weingarten, Inc. v. Sandefer*, 490 S.W.2d 941 (Tex.Civ.App.—Beaumont 1973, writ ref'd n. r. e.); *Prunty v. Bland*, 454 S.W.2d 881 (Tex.Civ.App.—Houston [1st Dist.] 1970, writ ref'd n. r. e.); Restatement (Second) of Agency §§ 503, 506, 507, 510 (1958). Moreover, in measuring the employer's duty, the age and experience of the employee must be considered since it may be negligent to furnish a minor with, or fail to supervise the minor in the operation of, a certain instrumentality when to take the same action with a grown man or an experienced employee would not constitute negligence. *Beaumont, S. L. & W. Ry. Co. v. Schmidt*, 123 Tex. 580, 72 S.W.2d 899 (1934, opinion adopted); *Landers v. West Lumber Co.*, 239 S.W. 195 (Tex.Com.App.1922, opinion adopted); *W. E. Grace Mfg. Co. v. Arp*, 311 S.W.2d 278 (Tex.Civ.App.—Dallas 1958, writ ref'd n. r. e.); *Dial v. Wilke*, 127 S.W.2d 379 (Tex.Civ.App.—Amarillo 1939, writ ref'd); Restatement (Second) of Agency § 494 (1958).

All plaintiff's witnesses, each with considerable experience, testified that in working cattle a well-trained and responsive horse was absolutely necessary. The qualities of a suitable cow horse are that he must have a good disposition, neck rein fairly well, respond to commands, be predictable, dependable, calm and quiet. Each witness testified that a horse which did not possess these qualities would be dangerous in doing cattle work; the danger being directly related to the lack of control over it. A cowboy must have complete control over and response from his cow horse or it is very possible the horse may collide with other horses or with the animals around which it is working.

The horse which Benny Farley was riding the day of the accident possessed none of the qualities of a suitable cow horse. It was foaled in 1967 by a mare placed upon the ranch for general use by Joe Whittenburg, president of M M Cattle Company. The colt was originally named Cimarron but was assigned the nickname "Crowbar" by Bunk Farley because of its cantankerous disposition. At the time of the accident Bunk Farley had been trying to break and train Crowbar for about a "season and a half." Bunk described the horse's response to training as "broncish," slow and "harder than the usual colt to get along with." He described the horse as not dependable, nervous, hardheaded and "green broke," meaning not yet fully trained. He testified that Crowbar did not rein well, had tried to throw him off on previous occasions and had stumbled with him several times. Bunk Farley was the only person who had ever ridden Crowbar. In addition, before

Crowbar could be ridden even by him it was necessary to pull him behind a pickup trailer for some distance to warm him up and "take the edge off."

In addition to Bunk Farley, four other witnesses who had observed Crowbar testified to the horse's dangerous propensities. According to these witnesses, Crowbar was stubborn, unresponsive, unpredictable and undependable. He was described as a "bronc" who was not fully trained. Several of these witnesses had specifically told Bunk Farley that they felt the horse was dangerous and that Bunk ought to get rid of the horse before he "got somebody hurt." One of the witnesses testified that on a prior occasion Crowbar had run toward the horse on which the witness was riding in a manner similar to the way Crowbar is alleged to have collided with Beebe's horse on the occasion in question.

Notwithstanding Bunk Farley's knowledge of Crowbar's dangerous nature, that no one else had ever ridden him before and that Crowbar had not been ridden at all for the last sixty to ninety days, on the day in question he directed Benny Farley to use the horse for the purpose of rounding up and moving calves. It was then necessary to pull Crowbar behind a pickup trailer for some distance before he was mounted. The calves to be moved had been on the range for some time, were not accustomed to being around people, were large and described as wild and nervous.

At the time of the accident Benny Farley was fifteen years of age. He had been riding horses since he was approximately four years old and by the time he was six to eight years old he began to help his father with the chores around the ranch. Benny was an experienced rider and described by his co-workers as a "good hand." Nevertheless, it was admitted he did not have as much experience as a full grown cowboy and that experience was a vital and necessary factor in performing this type of work. At least one witness indicated that inexperienced cowboys should be fully supervised when rounding up wild range calves. How-

ever, despite Benny Farley's lack of experience, he was assigned to round up the calves with Danny Beebe, a boy of approximately the same age as Benny. It is undisputed that at the time of the accident Bunk Farley, the foreman, was not supervising the activities of the two boys.

■ Considering the known dangerous nature of Crowbar and the necessity for supervision of a boy of Benny's years in this type of activity, we feel there was sufficient evidence submitted by the plaintiff to raise a fact issue of negligence.

## PROXIMATE CAUSE

■ Proximate cause in Texas consists of two concepts: (1) cause in fact and (2) foreseeability. Both of these elements must be present. *Clark v. Waggoner,* 452 S.W.2d 437 (Tex.1970); *Baumler v. Hazelwood,* 162 Tex. 361, 347 S.W.2d 560 (1961); *Ussery v. Ewell Hodges, Inc.,* 417 S.W.2d 332 (Tex.Civ.App.—Tyler 1967, writ ref'd n. r. e.); *Leatherwood Drilling Co. v. TXL Oil Corporation,* 379 S.W.2d 693 (Tex.Civ.App. —Dallas 1964, writ ref'd n. r. e.). Proximate cause cannot be established by mere conjecture or guess, but rather must be proved by evidence of probative force. *Leatherwood Drilling Co. v. TXL Oil Corporation, supra.* Proximate cause, like any other ultimate fact, may be established by circumstantial evidence. *Lynch v. Ricketts,* 158 Tex. 487, 314 S.W.2d 273 (1958); *Grossman v. Tiner,* 347 S.W.2d 627 (Tex.Civ.App. —Waco 1961, writ ref'd n. r. e.). The problem in the instant case is whether there is evidence from which reasonable minds could draw an inference that either a known dangerous horse or the failure of the foreman to supervise the activities of the young cowboys was the cause in fact of the collision in question. In searching the record for such evidence it must be kept in mind that the plaintiff need not exclude all possibility that the accident occurred other than as he alleges, but rather must show only that the greater probability is that

either the nature of the horse or the failure to supervise caused the collision. *Birmingham v. Gulf Oil Corporation,* 516 S.W.2d 914 (Tex.1974); *Burlington-Rock Island R. Co. v. Ellison,* 140 Tex. 353, 167 S.W.2d 723 (1943); *J. Weingarten, Inc. v. Brockman,* 135 S.W.2d 698 (Tex.Com.App.1940, opinion adopted); *B. M. & R. Interests v. Snyder,* 453 S.W.2d 360 (Tex.Civ.App.—Tyler 1970, writ ref'd n. r. e.); *Missouri-Kansas-Texas R. Co. of Texas v. Sanderson,* 174 S.W.2d 646 (Tex.Civ.App.—Eastland 1943, writ ref'd w. o. m.). Moreover, whether a particular act of negligence is a cause in fact of an injury has been said to be a particularly apt question for jury determination. Prosser, Law of Torts § 41 at 237 (4th ed. 1971).

The only individuals at the location of the accident were Danny Beebe and Benny Farley. Because of the serious nature of Benny Farley's injuries he was unable to testify or give any information relative to the event. The only testimony that could be given by anyone who saw or was directly connected with the collision was that of the other young cowboy, Danny Beebe. He testified that when the calf broke away from the herd he and Benny went after it, maneuvering their running horses so that they were on either side of the running calf. The procedure they were using to return the calf to the herd is called "laning" and is admittedly a dangerous procedure. Danny Beebe testified that while they were "laning" the calf back to the herd it became apparent to him that unless there was a change in the course being pursued by the horses a collision would result. Upon this realization he reined his horse away from the calf to the left; his horse responded and veered off in that direction. However, at almost the same time he reined away, he felt Crowbar collide with the right side of his horse and felt Crowbar's head hit his leg. Danny Beebe's horse stumbled to his knees and then got up. Danny Beebe then looked to the right and saw Benny Farley's horse standing over Benny. Danny Beebe testified he did not know what happened to the calf or what Benny Farley did to try to avoid the accident since from the time he reined his horse to the left he was looking in a direction away from the location of Benny Farley and the calf. Other witnesses testified the terrain was flat and there was nothing on the ground over which Crowbar could have stumbled.

Danny Beebe testified that at the time he reined his horse to the left there was sufficient time and distance so that, if Crowbar had gone or reined to the right, the collision could have been avoided. He testified that he did not see whether Benny tried to rein to the right or do anything to avoid the collision; he simply did not see anything that was occurring on or to the other horse. He did, however, state that Benny Farley was a good rider and was the kind of cowboy who knew how to get himself out of a tight situation if his horse responded well to reining. In addition, Bunk Farley gave his opinion, in response to a hypothetical question, that Benny would have reined his horse away in an attempt to avoid a collision in a situation such as that present in the instant case. The testimony of Danny Beebe and Bunk Farley supports an inference that Benny Farley tried to rein Crowbar to the right, away from the collision, at the time of the accident.

Moreover, there was ample testimony regarding the unresponsive and uncontrollable nature of Crowbar and the jury could also infer that the horse failed to respond to Benny Farley's control causing the collision. The court of civil appeals, however, felt that allowing the jury to draw these inferences from the evidence would be to pile "one presumption upon another presumption." 515 S.W.2d 697 at 705. We do not agree. First, the office of a true presumption is to invoke a rule of law that compels the jury to reach a conclusion in the absence of evidence to the contrary. *Sudduth v. Commonwealth County Mutual Ins. Co.,* 454 S.W.2d 196 (Tex.1970). *See* 9 Wigmore on Evidence § 2491 (3d ed. 1940); 1 McCormick & Ray, Texas Evidence § 51 (2d ed. 1956). In the instant case we

are not dealing with presumptions but rather with inferences which the jury may, or may not, draw from the evidence. Thus the rule against piling one presumption on another does not apply. We instead must look to the rules relating to inferences and it is well established that a number of inferences may be drawn from a single fact situation. *E. g., Peveto v. Smith,* 134 Tex. 308, 133 S.W.2d 572 (1939, opinion adopted); *Missouri-Kansas-Texas R. Co. of Texas v. Sanderson, supra.* The inferences to be drawn in the instant case are, though arising out of a single fact situation, each based on direct evidence admitted at trial. The inference that Benny attempted to rein Crowbar away to avoid a collision is based solely upon direct evidence of Benny Farley's characteristics as a cowboy. The inference that Crowbar would not respond to Benny's control, on the other hand, is based entirely upon evidence of Crowbar's dangerous characteristics.

In addition, as previously indicated, Benny Farley's allegations of negligence were not limited only to the claim that M M Cattle Company furnished him an unsuitable horse. He also alleged negligence in failing to properly supervise the roundup operation and that this was a proximate cause of the accident. Testimony was offered to show that the "laning" procedure the boys were using was dangerous, but because of their lack of experience they may not have realized the danger. It was emphasized that young boys require more supervision than fully grown, experienced cowboys. The jury could reasonably infer that a prudent foreman would have supervised the boys in their work and that the lack of supervision in the instant case was a proximate cause of the accident.

We believe the inferences arising from the direct evidence were sufficient to allow the case to go to the jury. The trial court thus erred when it directed a verdict for the defendant at the end of the plaintiff's case.

However, M M Cattle Company presents several defenses which it claims would require us to affirm the judgments of the trial court and the court of civil appeals notwithstanding the error in directing a verdict for the defendant.

## M M CATTLE COMPANY'S DEFENSES

■ M M Cattle Company first argues Benny Farley was contributorily negligent as a matter of law. It is asserted that the procedure of "laning" the calf which the young cowboys were using at the time of the accident is so dangerous as to be negligence as a matter of law. Although there was testimony that this procedure was dangerous, there was also testimony that it was commonly used. We do not feel it could be said as a matter of law that a reasonable fifteen-year-old boy under the same or similar circumstances would not have used this same procedure. *See Boaz v. White's Auto Stores,* 141 Tex. 366, 172 S.W.2d 481 (1943); *Dewhurst v. South Texas Rendering Co.,* 232 S.W.2d 135 (Tex.Civ.App.—San Antonio 1950, writ ref'd n. r. e.).

■ M M Cattle Company also seeks to absolve itself of liability by application of the well-established rule that the employer is not liable to an employee for injuries caused by the negligence of another employee when both are engaged in a common employment or enterprise. *E. g., Armour & Co. v. Morgan,* 108 Tex. 417, 194 S.W. 942 (1917); *Sandefur v. Sandefur,* 232 S.W.2d 111 (Tex.Civ.App.—Amarillo 1950, writ ref'd). M M Cattle Company claims that even if Benny Farley was not negligent in "laning" the calf certainly Danny Beebe was negligent in doing so, and, thus, Benny Farley's recovery is barred. For the reasons stated above, we do not believe there is sufficient evidence to establish negligence as a matter of law on the part of either of the boys in "laning" the calf. In addition, it is established that when the master's negligence is concurrent with that of a fellow servant, the fellow servant rule will not preclude recovery. *Fort Worth Elevators Co. v. Russell, supra; Armour & Co. v. Morgan, supra.*

█ M M Cattle Company further argues that the rule of parental immunity which protects Bunk Farley from suit similarly protects Bunk's employer, M M Cattle Company. We think this argument is foreclosed by this court's decision in *Felderhoff v. Felderhoff,* 473 S.W.2d 928 (Tex.1971). In that case it was determined that the rule of parental immunity would not bar a child's action against a farming partnership of which the child's father was a member. It was emphasized in that case that the accident occurred in the conduct of the business activities of the partnership and wholly outside the sphere of the father's parental duties and responsibilities. This is precisely the situation in the instant case. Bunk Farley, in directing Benny to ride Crowbar and in failing to supervise him in his activities, was acting solely for M M Cattle Company.

## ASSUMPTION OF THE RISK

M M Cattle Company contends that Benny Farley assumed the risk of riding Crowbar as a matter of law and thus should be barred from recovery, citing *Robert E. McKee, General Contractor v. Patterson,* 153 Tex. 517, 271 S.W.2d 391 (1954) and *Schiller v. Rice,* 151 Tex. 116, 246 S.W.2d 607 (1952). This contention presents the defense of *volenti non fit injuria* or, in other words, voluntary assumption of risk.

Recently, in *Rosas v. Buddies Food Store,* 518 S.W.2d 534, 538–539 (Tex.1975), Mr. Justice Steakley expressed cogent and compelling reasons supporting the abolishment of the defense of assumption of the risk in negligence cases. Mr. Justice Daniel and this writer favored such action at that time. In a concurring opinion Mr. Justice Walker, joined by Chief Justice Greenhill and Justices Pope, McGee and Denton, pointed out that *Rosas* did not directly involve assumption of risk. The concurring opinion recites:

"While I do not disagree with all that is said by Mr. Justice Steakley concerning the doctrine of *volenti non fit injuria,* it is my opinion that we should consider and deal with the doctrine in the context of a case involving that defense."

In the instant case assumption of the risk *is* asserted as a defense. This court is now squarely faced with the question of its continued viability. To require the parties to proceed to trial and appeal without making a decision on this critical issue would be an inefficient use of the judicial process and, furthermore, wholly unfair to the parties involved.

We have reconsidered the rationale and reasoning expressed in *Rosas* and find it persuasive. Particularly compelling is the fact that the Legislature has now adopted comparative negligence and thus evidenced its clear intention to apportion negligence rather than completely bar recovery.[2] Assumption of the risk is compatible with this rationale since that defense operates as a complete bar to recovery.

█ We therefore hold that for this trial, and henceforth in the trial of all actions based on negligence, *volenti non fit injuria* —he who consents cannot receive an injury —or, as generally known, voluntary assumption of risk, will no longer be treated as an issue. Rather, the reasonableness of an actor's conduct in confronting a risk will be determined under principles of contributory negligence. Unaffected will be the current status of the defense in strict liability cases and cases in which there is a knowing and express oral or written consent to the dangerous activity or condition. The reasons expressed for abolishing the defense in negligence cases do not obtain as to these situations.

Since M M Cattle Company's defenses do not require an affirmance of the trial court's judgment for the defendant, that judgment must be reversed. Accordingly, the judgments of the trial court and the court of civil appeals are reversed and the

**2.** Tex.Rev.Civ.Stat.Ann. art. 2212a.

case is remanded to the trial court for a new trial.

WALKER, STEAKLEY and REAVLEY, JJ., dissent with opinions.

WALKER, Justice (dissenting) in which REAVLEY, J., joined.

I respectfully dissent, because in my opinion there is no evidence to support a finding that any negligence of respondent was a proximate cause of the accident. As pointed out in the majority opinion, the problem here is not one of piling presumption upon presumption. It is only by piling assumption upon assumption, however, that the Court is able to say that the evidence supports an inference that the accident probably would not have occurred if petitioner had not been permitted to ride Crowbar. This approach should make it fairly easy to find evidence of proximate cause in any case. In this instance:

(1) The majority first assume that the calf did not turn to the right and into Crowbar's legs, thereby causing the fall. According to Danny Beebe's testimony, the calf was running between the two horses before the accident. It was not in front of them. It was not behind them. The two horses were on a collision course, and they were "gaining on the calf." This means that things were beginning to get rather crowded for the calf, which certainly had every opportunity to be aware of its predicament. With the horses and their riders looming above it on either side and the distance between them rapidly closing, continued running in the same direction offered little promise of either freedom or safety. In view of all the circumstances and since Crowbar did·fall, it seems quite likely that the calf attempted to extricate itself by turning to the right. That this occurred is entirely consistent with all the facts established by the evidence, and the record is completely silent as to what the calf did or did not do just prior to Crowbar's fall.

(2) The majority further assume that Crowbar did not stumble. While there is testimony that the terrain was flat, horses as well as people occasionally stumble over their own feet. This may seem rather unlikely in the ordinary case, but we do not have an ordinary case here. It is clear from the evidence that unless the calf turned to get out of the way, Crowbar was about to run into or step on it. He may well have stumbled over the calf or he may have stumbled in his efforts to avoid running into the calf.

(3) The majority further assume that petitioner recognized the danger in time to avoid the accident by reining to the right if he had been riding a suitable horse. There is not a scintilla of evidence from which can be inferred that he probably did or probably did not. For aught that appears in the record, petitioner may have been watching the calf so intently that he did not realize the horses were about to collide.

(4) The majority further assume·that petitioner attempted to rein Crowbar to the right. There is no proof of this. Danny did not know what petitioner did. Bunk Farley expressed the opinion that petitioner would have reined his horse away in an effort to avoid a collision, but this answer was given in response to a hypothetical question as to what petitioner would have done where two horses were running together, toward each other, and there was going to be a collision if the riders did not rein off. In ruling on an objection to the question, the trial court made it clear that the answer was admitted for a very limited purpose:

COURT: He's asking the question—as I view the question—would this young man have—from the knowledge of this witness, would this young man normally have reined the horse. He's not saying he did or he didn't. And it's true that the depositions show that the other person there didn't know what happened. He's not saying—he's just saying, did he have the ability, the

knowledge as a cowboy to rein away. Now, he can ask that question. I'm not letting him ask questions about whether he did or he didn't. I'm just asking, would he have possessed the capabilities of a cowboy to have done that. That's all I'm permitting.

If the answer is now to be used as proof that petitioner probably did rein to the right, it is necessary to assume, as does the Court here, that the only problem was the fact that the two horses were on a collision course. If Crowbar had stumbled, an experienced rider would doubtless have attempted to pull his head up. If the calf had turned to the right and was attempting to run in front of Crowbar, petitioner would have reined to the left if he thought that was the best way to avoid the calf. The accident could thus have been caused by Crowbar's response to a left rein rather than his failure to respond to a right rein. It could have been caused by petitioner's failure to recognize the danger or by Crowbar's stumbling or by his being tripped by the calf. On the present record one hypothesis is as likely as the other, because we simply do not know and cannot reasonably determine from the evidence what probably caused the accident.

(5) The majority finally assume that the accident probably would not have occurred if petitioner had been riding another horse. This would be a reasonable inference if the assumed facts mentioned above had been proved. On the present record it is at the top of the heap of assumptions, because it must rest on facts assumed by the Court but not established or fairly inferable from the evidence.

I agree that it is well to eliminate *volenti* as a separate defense to be considered by the jury in ordinary negligence cases. There are, however, exceptional situations where it should be retained as a device for use by the court, and in my opinion these exceptional situations should be staked out on a case-by-case basis. For example, there are certain "implied consent" cases that do not involve "knowing and express oral or written consent to the dangerous activity or condition" but in which there should be no recovery even though the plaintiff's conduct might be regarded as reasonable under the circumstances. See Restatement, Second, Torts § 496 C.

I would affirm the judgment of the Court of Civil Appeals.

STEAKLEY, Justice (dissenting).

I agree with the views expressed in the dissenting opinion of Justice Walker with respect to the problem of proximate cause. In all other respects I am in full accord with and join in the majority opinion.

REAVLEY, Justice (dissenting).

I agree with what Justice Walker has written. Aside from the proximate cause question, it will be an improvement to have the trier of fact include in the determination of contributory negligence that aspect of fault which we presently label as assumption of risk or *volenti non fit injuria*. However, there are *volenti* considerations, beyond the reservations expressed in the Court's opinion, that bear upon the legal determination of duty.