Opinion filed November 8, 2007











 
 
  
 
 







 
 
  
 
 




 

Opinion filed November 8,
2007

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                 ____________

 

                                                          No. 11-06-00145-CV

                                                    __________

 

                            HENDRICK
MEDICAL CENTER, Appellant

                                                             V.

                                  AMANDA
BURNS SMITH, Appellee

 



 

                                         On
Appeal from the 350th District Court

                                                          Taylor
County, Texas

                                                   Trial
Court Cause No. 7079-D

 



 

                                              M
E M O R A N D U M   O P I N I O N

This
case arises from an on-the-job injury.  Amanda Burns Smith received an
electrical shock while she was plugging in a refrigerator in the kitchen of her
employer, Hendrick Medical Center. Hendrick was a nonsubscriber to workers= compensation insurance. 
Smith brought this negligence action against Hendrick.  The jury found in favor
of Smith on her negligence claim and awarded various elements of damages to
her.  The trial court entered judgment in accordance with the jury=s verdict.  In this appeal,
Hendrick challenges, among other things, the legal and factual sufficiency of
the evidence to support the jury=s
finding of negligence.  Because the evidence was legally insufficient to
support the jury=s
negligence finding, we reverse and render judgment that Smith take nothing by
her claims against Hendrick.

 








                                                               Background
Facts

Smith
began employment with Hendrick in January 2001.  She worked on the tray line in
Hendrick=s kitchen. 
As a worker on the tray line, she helped prepare meals for Hendrick=s patients.  During her
work shift on April 2, 2001, Smith noticed that one of the refrigerators in the
tray line area had come unplugged.  Smith attempted to plug the refrigerator=s plug back into a
receptacle (also referred to in the record as an outlet).  As she was putting
the plug into the receptacle, she received an electrical shock.  Later that
day, Smith received treatment in Hendrick=s
emergency room for injuries she received from the shock.  Smith began
experiencing seizures after the incident, and she received medical treatment
for the seizures.

Smith
brought this negligence action against Hendrick.  In her petition, Smith
alleged that Hendrick was negligent in the following respects:  in failing to
provide her a safe place to work; in failing to supply the proper equipment for
the tasks needed to complete the job; in failing to use due care that would
have been maintained by an employer of ordinary prudence under the same or
similar circumstances; in failing to comply with applicable building codes,
ordinances, statutes, standards of care, and/or laws with regard to the
placement and maintenance of the plug receptacle that injured her; in failing
to install a ground fault circuit interrupter (GFCI) receptacle; in failing to
properly use flexible cords and cables pursuant to 29 C.F.R. 1920.305(g); in
failing to install a twist-lock male plug and corresponding receptacle; and in
failing to install a plug and receptacle designed to prevent energization until
insertion was complete.

At
trial, Smith testified that she remembered getting shocked.  However, she could
not remember the details of how she got shocked, such as whether she was
touching the prongs of the plug as she attempted to put the plug into the
receptacle.  Smith presented Charles Baucum, a master electrician, as an expert
witness, and Hendrick presented Dr. Don Russell, Ph.D., an electrical engineer,
as an expert witness.  Baucum testified that, in his opinion, the shock
resulted from Smith touching the prongs of the plug as she was putting the plug
into the receptacle.  Similarly, Dr. Russell testified that he believed
the incident occurred because Smith touched one or more of the prongs of the
plug when she inserted the plug into the receptacle.

 








After
the conclusion of the evidence, the trial court instructed the jury on the
duties owed by  an employer to its employees.  The trial court stated the
following in its charge: 

Under the laws of the State of Texas an employer owes the following,
continuing, non-delegable duties towards their employees:

 

(1)
An employer has a duty to provide his employees with a reasonably safe place to
work.

 

(2)
An employer has a duty to furnish an employee with safe and suitable appliances
or tools so that the employee may do the work with reasonable safety.

 

(3)
An employer has the duty to instruct workers about safety, and when
appropriate, post safety rules.

 

(4)
An employer has the duty to warn employees of hazards of their employment.

 

An
employer must use ordinary care in providing a reasonably safe workplace.

 

The jury found
in favor of Smith on her negligence claim and awarded Smith the following
damages: $125,000 for past physical pain and mental anguish; $75,000 for future
physical pain and mental anguish; $44,000 for past medical expenses; $50,000
for future medical expenses; $48,500 for past loss of earnings; $30,000 for
future loss of earnings; $75,000 for past physical impairment; and $25,000 for
future physical impairment.  The trial court entered judgment based on the jury=s verdict.

                                                                 Issues
on Appeal

Hendrick
presents seven issues on appeal.  In its first issue, Hendrick challenges the
legal and factual sufficiency of the evidence to support the jury=s negligence finding.  In
its other issues, Hendrick asserts (1) that the jury charge contained error and
(2) that the evidence was legally and factually insufficient to support various
elements of the damages awarded to Smith.  Based on our disposition of Hendrick=s first issue challenging
the legal sufficiency of the evidence, we need not address Hendrick=s other issues. Tex. R. App. P. 47.1.

 

 








                                                              Standard
of Review

Hendrick
challenges the legal sufficiency of the evidence to support the jury=s negligence finding.  In
analyzing a legal sufficiency or no-evidence issue, an appellate court must
consider the evidence in the light most favorable to the challenged finding and
must indulge every reasonable inference that would support it.  City of Keller
v. Wilson, 168 S.W.3d 802, 821-22 (Tex. 2005).  A reviewing court
must credit favorable evidence if a reasonable fact-finder could and disregard
contrary evidence unless a reasonable fact-finder could not.  Id. at
821-22, 827.  The appellate court must determine whether the evidence at trial
could enable reasonable and fair-minded people to find the facts at issue.  Id.
at 827.  A no-evidence challenge may be sustained only when (1) the record
discloses a complete absence of a vital fact, (2) the court is barred by rules
of law or evidence from giving weight to the only evidence offered to prove a
vital fact, (3) the only evidence offered to prove a vital fact is no more than
a mere scintilla, or (4) the evidence conclusively establishes the opposite of
a vital fact.  Id. at 810.

                                                                  Applicable
Law

To
establish negligence, the plaintiff must produce evidence of a legal duty owed
by the defendant to the plaintiff, a breach of that duty, and damages
proximately caused by that breach.  Lee Lewis Constr., Inc. v. Harrison,
70 S.W.3d 778, 782 (Tex. 2001).  Whether a duty exists is a threshold question
of law; liability cannot be imposed if no duty exists.  Kroger Co. v. Elwood,
197 S.W.3d 793, 794 (Tex. 2006).

An
employer has a duty to use ordinary care in providing a safe workplace.  Elwood,
197 S.W.3d at 794; Farley v. M M Cattle Co., 529 S.W.2d 751, 754 (Tex.
1975).  It must, for example, warn an employee of the hazards of employment and
provide needed safety equipment or assistance.  Elwood, 197 S.W.3d at
794; Werner v. Colwell, 909 S.W.2d 866, 869 (Tex. 1995); Farley,
529 S.W.2d at 754.  An employer must also furnish reasonably safe
instrumentalities with which its employees are to work.  Farley, 529
S.W.2d at 754.








However,
an employer is not an insurer of its employees=
safety.  Elwood, 197 S.W.3d at 794.  An employer owes no duty to warn of
hazards that are commonly known or already appreciated by the employee.  Jack
in the Box, Inc. v. Skiles, 221 S.W.3d 566, 567 (Tex. 2007); Elwood,
197 S.W.3d at 794.  Similarly, if an employer=s
business is neither complex nor hazardous or the dangers of the job are obvious
or are fully understood by the employee, the employer has no duty to adopt
safety rules.  Patino v. Complete Tire, Inc., 158 S.W.3d 655, 660 (Tex.
App.CDallas 2005, pet.
denied).  An employer owes no duty to provide equipment or assistance that is
unnecessary to the job=s
safe performance.  Elwood, 197 S.W.3d at 794.  And, when an employee=s injury results from
performing the same character of work that employees in that position have always
done, an employer is not liable if there is no evidence that the work is
unusually precarious.  Id.; Werner, 909 S.W.2d at 869.

                                                             The
Evidence at Trial

We
have reviewed all the evidence, and we summarize the evidence relevant to the
determination of the negligence issue below.

The
Incident  

The
evidence showed that Smith worked on the tray line in Hendrick=s kitchen.  Hendrick
employees assembled patient meals along the tray line, which was a conveyor
belt system.  Various work stations existed on the tray line.  On April 2,
2001, Smith was working at the cold foods station of the tray line.  At that
time, two portable refrigerators B
refrigerators with wheels B
were in Smith=s
station.  After noticing that one of the refrigerators had become unplugged,
Smith attempted to plug the refrigerator back into a receptacle that was
located along the tray line.  Smith received an electrical shock as she was
putting the plug into the receptacle.  The shock occurred at about
4:00 p.m.  Although the record reflects that other Hendrick employees may
have witnessed the shock, the other employees did not testify and were not
named in the record.  Hendrick did not dispute at trial that Smith received the
electrical shock.

Smith=s Testimony

Smith
testified that the subject refrigerator had wheels and sometimes would come
unplugged when its cord got tangled up in its wheels.  Smith said that the plug
on the refrigerator was black. She said that she had plugged the refrigerator
back in Aquite
frequently@ before the
date of the incident.  She also said that, before the incident, she plugged and
unplugged plugs all the time and that she had not had any problems with
equipment in the kitchen.








On
the day of the incident, Smith noticed that one of the refrigerators had come
unplugged. Smith testified that she remembered plugging the plug back in and
getting shocked but that she did not remember very much of what happened to her
that day.  She said that she did not know how she got shocked and that she did
not recall whether she had touched the prongs of the plug as she was plugging
it into the outlet.  Smith said that the first thing she remembered clearly
after being shocked was being in the emergency room.  Smith testified that it
was common sense not to touch the prongs on a plug as you plug it in.  She said
that she was wearing rubber-soled shoes when she was shocked. Smith further
testified that she was not aware of there being anything wrong with the
equipment, cords, receptacles, or plugs on the date of the incident.

Smith
performed a demonstration at trial during which she put her fingers on the
prongs of a non-live plug and attempted to plug it into a non-live receptacle. 
During the demonstration, Smith could not get the plug all the way into the receptacle
while touching the prongs of the plug with her fingers.

Descriptions
of the Incident in Documentary Evidence         

Although
Smith could not remember the details of the incident during her testimony, some
of the documents that were introduced into evidence contained descriptions of
the incident.  For example, the emergency room record for the date of the
incident indicated that Smith was shocked while plugging in an appliance and
that, at the time, she was standing in water and wearing rubber-soled shoes. 
The evidence showed that Smith filled out an employee incident report on the
date of the incident.  In the report, Smith stated that, as she was trying to
push the refrigerator, the plug was under the wheel of the refrigerator and
that the refrigerator came unplugged.  She also stated, AI went to push the plug back in.  It zapped
me.@  The evidence
showed that, on April 5, 2001, Smith filled out a workers= compensation report.  In
the report, Smith indicated that, at the time of the incident, she was standing
in some water that she did not know was on the floor.

Jerry
Griewahn=s
Testimony








Smith
called Jerry Griewahn, a former employee of Hendrick, as a witness.  Griewahn
testified that he was Hendrick=s
director of food services from 1998 until 2005.  He said that Hendrick
employees working along the tray line in the kitchen had experienced electrical
shocks prior to April 2, 2001.  He said that, from 1998 until April 2, 2001, Aemployees got shocked. . .
. It would happen periodically several times a month.@  He further testified that the electrical
system in the kitchen was from the 1940s and that a lot of the equipment was
old and in poor condition. Griewahn also testified that there was water on the
floor in the kitchen all of the time.  Griewahn said that Smith=s supervisor, Gwyn Israel,
had prepared a supervisor incident report relating to the incident and that the
report indicated that the equipment involved in the incident was working
properly at the time of the incident.  Griewahn acknowledged that he had Asigned off@ on the supervisor incident
report.

Charles
Baucum=s
Testimony

Smith
presented Baucum, a master electrician, as an expert witness.  Baucum inspected
Hendrick=s kitchen
about four years after the incident.  Baucum testified that, during the
inspection, he saw evidence of arcing in the receptacles.  Baucum explained
that arc marks on a receptacle show that A[plugs
have] been pulled out with the appliance operating continuously, repeatedly.@  However, Baucum did not
offer any testimony as to whether he believed arcing had anything to do with
Smith being shocked.  Instead, Baucum testified that, in his opinion, Smith was
shocked because she touched the prongs of the plug when she was plugging it
in.  Baucum also testified that it was common sense not to touch the prongs of
a plug when you are plugging it into a receptacle.








Baucum
testified that the incident could have been prevented in two ways.  First, he
said that Hendrick could have utilized a ground fault circuit interrupter
(GFCI) receptacle, as opposed to the actual receptacle utilized by Hendrick. 
Second, he said that Hendrick could have utilized a twist-lock plug on the
subject refrigerator.  Baucum testified that the applicable electric code B the National Electric Code
and the City of Abilene=s
supplement to the National Electric Code B
did not require Hendrick to utilize a GFCI or a twist-lock plug in its
kitchen.  Baucum testified that, in his opinion, Hendrick was negligent in
failing to utilize either a GFCI or a twist-lock plug or receptacle.  Baucum
explained that GFCI receptacles trip at very low levels of ampacity and that,
therefore, GFCI receptacles protect the person plugging in the plug from being
shocked.  Baucum said that GFCI receptacles should be installed in commercial
kitchens.  Baucum explained that a twist-lock plug has a twisting mechanism
that locks and unlocks the plug.  Baucum testified that, had Hendrick utilized
a twist-lock plug on the refrigerator, the incident would not have occurred
because the twist-lock plug would have prevented the refrigerator from becoming
unplugged in the first place.  During direct examination, Baucum testified that
either a GFCI or a twist-lock plug would have prevented an electrical shock. 
During cross-examination, Baucum testified that a GFCI plug may only have
minimized the shock as opposed to preventing the shock altogether.

During
cross-examination, Hendrick=s
attorney asked Baucum various questions relating to the presence of water on
the floor at the time Smith was shocked.  The following exchange took place:

 

Q.
And even assuming that there was water, and I think that there is no dispute
that there was water on the floor, and it=s
your understanding that there was water on the floor.  Right?

 

A.
Yes.

 

Q.
Now, if I=m standing
in water and I=m
barefoot and I push a plug that=s
come back out and I push it back into the receptacle without touching the
prongs, I am not going to get shocked, am I?

 

A. 
As long as everything else is in working condition, no.

 

Q. 
Okay.  Well, in terms of the receptacle and the plug, you don=t have any evidence that
there was anything wrong with them, do you?

 

A. 
No.

 

Q.
And in terms of the cord, you don=t
have any evidence that there was anything faulty with the cord either, do you?

 

A. 
No.

 

Q. 
And what about the refrigerator?  Do you have any evidence that the
refrigerator wasn=t
properly grounded or something like that?

 

A. 
No.

 

Q. 
So as far as you know, everything was working properly at the time.  Correct?

 

A. 
Yes.

 

Q. 
And it=s fair to say
that it was all in accordance with code, too.  Right?

 

A. 
Yes.








 

Q. 
Nothing B no violation
of the code with the plug, the receptacle, or the cord at the time?

 

A.
Not at that time.

 

. .
. .

 

Q. 
Now, if she was standing in water in this area here in front of the
refrigerator, and she bends and she touches the prongs of the plug, she sticks
it in and gets zapped, is that going to make any difference to her?

 

A. 
Is what going to make any difference?

 

Q. 
The water, the presence of the water.

 

A.
Yes.

 

Q. 
What difference is it going to make?

 

A. 
It=s going to make her
more cont B more B continuity with the
ground; it=s going to
make her more [likely] to be shocked.

 

Q. 
Okay.  So if there is some kind of conduit, if there=s some kind of path through the water, then
that=s going to happen
as you have just explained.  Right?

 

A. 
Yeah.  It will more or less concentrate the electric.

 

Q. 
Okay.  Now, what happens if I=m
wearing rubber-soled shoes?  Does that make any difference?

 

A. 
If they are rubber-soled and don=t
have holes in them, that sort of thing, yes.

 

Q. 
Right.  Because rubber isn=t
a conduit, is it?

 

A. 
No.

 

Q. 
It stops the current from flowing through?

 

A. 
Correct.

 

Q. 
And so if I=m standing
in water and there isn=t
a hole in my shoe and B

 








A. 
The water is not high enough.

 

Q. 
B there is no contact
with my feet from the water, that water is not going to make any difference at
all, is it?

 

A. 
The water will not.

 

Darrell Dorsett=s
Testimony

Smith
called Darrell Dorsett as a witness.  Dorsett testified that he was a master
electrician and that he had been employed by Hendrick for fifteen years.  He
said that he did electrical maintenance work at Hendrick.  Dorsett testified
that, during his fifteen years at Hendrick, he had probably changed out every
single plug in the kitchen area at least once.

Dorsett
testified that, on April 2, 2001, at about 4:30 p.m., his supervisor told him
that someone had been shocked on the tray line.  Dorsett said that, about a
minute or two later, he arrived at the tray line.  He also said that Hendrick
employees pointed to the area where Smith had been shocked.  Dorsett testified
that he checked the plugs, receptacles, cords, and both of the refrigerators in
the area and that he could not find anything wrong with them.

Dorsett
also testified that Smith=s
supervisor, Israel, brought Smith into the tray line area to talk with him. 
Dorsett said that, after he asked Smith what had happened, Smith grabbed the
plug and went to plug it in with one finger touching the hot prong of the plug
and another finger touching the neutral prong of the plug.  Dorsett said that
the subject plug had three prongs.  He also said that he stopped Smith from
plugging the plug in that way because a person touching the hot and neutral
prongs on a plug while plugging it in can get shocked.  Dorsett said that he
plugged the plug into the receptacle and that he told Smith to hold the plastic
part of the plug while plugging it in.

David Allen=s
Testimony 








Hendrick
called David Allen as a witness.  Allen testified that he was the director of
food and nutrition at Hendrick and that he had been employed at Hendrick for
about eleven years.  Allen testified that tray line employees were required to
wear rubber-soled shoes for the purpose of minimizing the risk of slips and
falls.  During cross-examination, Allen testified that it was foreseeable water
could get onto the floor of the kitchen and that there was at least one drain
in the kitchen floor.  Allen acknowledged that it was possible a person could
be standing in water in Hendrick=s
commercial kitchen, come into contact with an electrical source, and get
shocked or electrocuted.

Gwyn
Israel=s
Testimony

Hendrick
also called Israel as a witness.  Israel testified that she was the food
service manager for Hendrick and that she had been employed by Hendrick for
twenty-six years.  She said that, on April 2, 2001, another Hendrick employee
told her that something was wrong with Smith.  Israel said that she went to
check on Smith and that Smith told her she had been shocked.  Israel testified
that the shock had come from a plug that was not pushed in all the way.  Israel
said that she noticed the plug was about halfway out of the receptacle.  She
believed that Smith must have touched the prongs of the plug.  Israel testified
that she did not see anything wrong with the plug and that it was the kind of
plug that Smith had plugged in all the time.  Israel said that condensation
from the refrigerators had caused some water to be on the floor in the area but
that there was A[n]ot
a whole lot@ of water
on the floor.

Israel=s testimony contradicted
Dorsett=s testimony
that he was in the tray line area soon after the incident.  Israel said that
she did not see Dorsett in the tray line area on the day of the incident and
that she would have seen him had he arrived in the area by about 6:00 p.m.

During
cross-examination, Israel testified that Hendrick replaced the plugs and cords
on the refrigerators if they needed repair.  She said that Hendrick did not
replace the cords on the refrigerators once or twice a year but replaced them
if they got frayed and needed replacement as a result of being pushed around
and pulled out of sockets.  However, Israel acknowledged testifying in her
deposition that Hendrick replaced the cords and plugs on the refrigerators
several times a year.

Don
Russell=s
Testimony








Hendrick
presented Dr. Don Russell, an electrical engineer, as an expert witness.  Dr.
Russell inspected Hendrick=s
kitchen about four years after the incident in question.  As to the cause of
the incident, Dr. Russell believed that Smith was touching one or more of the
prongs of the plug as she inserted it.  Dr. Russell testified that the electric
code of the City of Abilene, which was the National Electric Code as adopted by
the City of Abilene, established the applicable standard of care in this
matter.  Dr. Russell said that the types of plugs, cords, and receptacles that
Hendrick used at the time of the incident met the national standards for such
apparatuses and the standard of care applicable to commercial kitchens in
Abilene, Texas.

Dr.
Russell also testified that he found no code violations in Hendrick=s electrical system that
contributed in any way to the incident.  Dr. Russell also said that there was
no evidence that the subject refrigerator=s
cord was damaged at the time of the incident.  Dr. Russell testified that
Hendrick=s electrical
system and associated equipment, including the subject receptacle, were in
proper operating condition and well maintained at the time of the incident.

                                                                        Analysis

To
establish negligence, Smith had the burden to produce evidence of a legal duty
owed by Hendrick to her, a breach of that duty, and damages proximately caused
by that breach.  Lee Lewis Constr., 70 S.W.3d at 782.  Hendrick asserts
that the undisputed evidence established, among other things, that Smith
sustained the shock because she touched the prongs of the plug as she pushed
the plug into the outlet and that the subject refrigerator, cord, plug, and
outlet were all in good working order and met the applicable code.  Hendrick
argues that, based on the undisputed evidence and because (1) there was no
evidence establishing what a reasonably prudent employer would have done under
the circumstances, (2) there was no evidence that the work being performed by
Smith was unusually precarious, and (3) Smith admitted that it was common sense
not to touch the prongs of a plug while plugging the plug into an outlet, the
evidence was legally and factually insufficient to support the jury=s finding of negligence. 
Smith asserts that the evidence was legally and factually sufficient to support
the jury=s negligence
finding for two reasons.  First, Smith argues that, based on the evidence, the
jury could have believed that she was shocked by a worn cord or plug instead of
by touching the prongs of the plug and that, therefore, the evidence was
legally and factually sufficient to establish that Hendrick breached its duty
to provide a reasonably safe workplace and its duty to furnish reasonably safe
instrumentalities.  Second, Smith asserts that, even if the jury believed she
received the shock by touching the prongs of the plug, the evidence was legally
and factually sufficient to establish that Hendrick had a duty to use a GFCI
receptacle or a twist-lock plug and breached its duty by failing to do so.








We
first address Smith=s
contention that the evidence was legally and factually sufficient to support a
jury finding that she was shocked by a worn cord or plug.  To support her
contention, Smith essentially makes a two-tiered argument.  She first attacks
the expert testimony that she touched the prongs of the plug.  She then asserts
that the evidence was sufficient to allow a jury to reasonably infer Athat the cord and plug that
shocked [her] was worn out and needed to be replaced.@ Smith=s
own expert Baucum and Hendrick=s
expert Dr. Russell both expressed opinions that Smith received the shock
because she had touched one or more of the prongs of the plug.  In her
appellate brief, Smith contends that Dr. Russell=s
and Baucum=s opinions B that she touched the
prongs B were entitled
to no weight because they were based either on (1) a false assumption that she
had admitted touching the prongs or (2) an examination of a plug and cord that
were not involved in the incident in question.[1] 
She also contends that the demonstration at trial Aclearly showed@
that it was physically impossible for her to insert a plug into an outlet while
holding the prongs of the plug.  However, the demonstration showed, at most,
that Smith could not get the plug all the way into the receptacle while
touching the prongs of the plug.

            Smith
asserts that A[t]he
undisputed fact that the cord and plug examined by the experts was not the one
that shocked [her] was critical.@ 
She then sets forth the following facts in support of her contention that a
jury could have believed she was shocked by a worn out cord or plug: (1) Israel=s testimony that the cords
on the refrigerators needed replacement several times a year because they
became frayed; (2) Dorsett=s
testimony that, during his fifteen years at Hendrick, he had probably changed
out every single plug in the kitchen area at least once; (3) rolling the
refrigerators around and pulling out the plugs from receptacles caused wear and
tear to the cords and plugs; (4) worn plugs became loose and easier to pull out
of the receptacles; (5) pulling a plug out of a receptacle when there is still
an electrical load on the line, such as a running refrigerator, causes
electrical arcing; and (6) a frayed cord creates a clear hazard.

After
setting forth the above evidentiary facts, Smith contends that a reasonable
jury could infer that she received the shock from a worn out cord and plug that
needed to be replaced, Awhich
is why the experts saw a replacement.@ 
Smith also relies on Griewahn=s
testimony that kitchen Aemployees
got shocked. . . . It would happen periodically several times a month.@  Smith contends that it is
much more likely the employees were shocked several times a month from worn out
cords and plugs than from the employees touching the prongs.  Smith also
contends that the jury could have concluded her shock came from electrical
arcing or a break in the cord insulation, as opposed to her touching the prongs
of the plug.

Based
on the contention that a reasonable jury could have inferred that she received
the shock from a worn out cord or plug, Smith asserts that the evidence was
legally sufficient to establish Hendrick breached its duties to furnish a
reasonably safe workplace and to furnish reasonably safe instrumentalities with
which its employees are to work.  Specifically, Smith asserts that Hendrick
breached these duties by Arequiring
employees to handle cords and plugs that are frayed or worn out.@

We
apply the above legal sufficiency of the evidence standard of review in
determining whether the evidence was legally sufficient to support a finding
that Smith was shocked by a frayed or worn out cord or plug.  No witness
testified that the cord or plug involved in the incident were frayed or worn at
the time of the incident.  Instead, the only testimony on the issue was to the
contrary.  Dorsett testified that he could not find anything wrong with the
plugs, cords, receptacles, or both refrigerators in the area when he inspected
them on the date of the incident.  Israel testified that she did not see
anything wrong with the plug on the date of the incident.  While the jury was
free to disbelieve the testimony of Dorsett and Israel, Smith offered no
evidence that the cord and plug were not in good working order at the time of
the incident.  Baucum testified that he did not have evidence that anything was
wrong with the subject cord, plug, receptacle, or refrigerator and that, as far
as he knew, everything was working properly at the time of the incident.  Smith
testified that she was not aware of there being anything wrong with the
equipment, cords, plugs, or receptacles on the date of the incident.








None
of the witnesses were asked whether Hendrick had replaced the subject cord and
plug after the incident and, if so, when Hendrick replaced the subject cord and
plug.  Nor did any of the witnesses provide any testimony on these issues. 
Thus, there was no direct evidence that Hendrick had replaced the subject cord
and plug.  Because there was no such direct evidence, Smith attempts to rely on
inferences.  She asserts that, based on the fact that Baucum and Dr. Russell
saw a replacement cord and plug when they inspected the kitchen about four
years after the incident, it is reasonable to infer (1) that the cord and plug
had been replaced because they were worn out and (2) that the cord and
plug were worn out and needed to be replaced on the date of the incident. 
Because there was no direct evidence that Smith was shocked by a worn out cord
or plug, Smith attempts to stack another inference B that she was shocked because the cord and
plug were worn out B
on top of the inference that the cord and plug were worn out on the date of the
incident.

An
inference cannot be based on surmise or speculation.  Briones v. Levine=s Dep=t Store, Inc., 446
S.W.2d 7, 10 (Tex. 1969); Prieto v. Val Verde Mem=l Hosp., 747 S.W.2d
487, 490 (Tex. App.CSan
Antonio 1988, no writ).  Assuming that Baucum and Dr. Russell saw a replacement
cord and plug when they inspected the kitchen about four years after the
incident, it may be reasonable to infer that Hendrick had replaced the cord and
plug because they were worn out.  However, the fact that Hendrick may have
replaced the cord and plug at some point during the four-year period, which is
a substantial length of time, does not support a reasonable inference that the
cord and plug were frayed or worn out on the date of the incident.  As stated
above, there was no direct evidence establishing whether Hendrick replaced the
subject cord and plug after the incident and, if so, when Hendrick replaced the
subject cord and plug.  Because there was no evidence showing when Hendrick
replaced the cord and plug, an inference that the cord and plug were worn out
on the date of the incident would be based on speculation.  Therefore, such an
inference would be improper.  For the same reason, even if the jury believed
that Hendrick replaced the cords and plugs on the refrigerators several times a
year, that conclusion does not support a reasonable inference that the cord and
plug were worn out and needed to be replaced on the date of the incident.








The
evidence did not support an inference that the plug and cord were worn out on
the date of the incident for another reason.  Smith attempts to stack an
inference that the cord and plug were worn out on the date of the incident on
the inference that Hendrick replaced the cord and plug because they were worn
out.  However, a vital fact may not be established by piling inference upon
inference.  Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,
435 S.W.2d 854, 858 (Tex. 1968); Entex, a Div. of Noram Energy Corp. v.
Gonzalez, 94 S.W.3d 1, 8 (Tex. App.CHouston
[14th Dist.] 2002, pet. denied); see also Marathon Corp. v. Pitzner, 106
S.W.3d 724, 728 (Tex. 2003) (A[A]n
inference stacked only on other inferences is not legally sufficient evidence.@); Ice Bros., Inc. v.
Bannowsky, 840 S.W.2d 57, 61 (Tex. App.CEl
Paso 1992, no writ) (A[A]n
inference cannot be drawn from facts established by another inference.@).  Facts from which an
inference may properly be drawn must be established by direct evidence, not by
other inferences.  Rounsaville v. Bullard, 276 S.W.2d 791, 794 (Tex.
1955); Entex, 94 S.W.3d at 8.  Therefore, Smith cannot establish an
inference B that the
cord and plug were worn out on the date of the incident B by stacking it on another inference.  

Even
if a jury could reasonably infer that the cord and plug were worn out on the
date of the incident, the jury could not reasonably infer that Smith was
shocked because the cord and plug were worn out.  There was no testimony B expert or otherwise B that Smith was shocked by
a frayed or worn out cord or plug.  Based on the above authorities, Smith
cannot stack an inference that she was shocked by a frayed or worn out cord or
plug on an inference that the cord and plug were worn out on the date of the
incident.  Pitzner, 106 S.W.3d at 728; Entex, 94 S.W.3d at 8.

Griewahn
testified that kitchen employees were shocked several times a month.  Relying
on Griewahn=s
testimony, Smith contends that it is much more likely the employees were
shocked several times a month from worn out cords and plugs than from touching
the prongs.  Smith=s
contention is based on speculation because there was no evidence that any
employee had ever been shocked by a frayed or worn out cord or plug.  Griewahn=s testimony does not
support a reasonable inference that the subject cord or plug were worn out on
the date of the incident or that Smith was shocked by a worn out plug or cord
because either inference would be based on speculation.   Briones, 446
S.W.2d at 10.

There
was neither direct evidence that the subject cord and plug were worn out and
needed to be replaced at the time of the incident nor any evidence that would
support an inference that the cord and plug were worn out at the time of the
incident.  The jury could not have reasonably concluded that the cord and plug
were worn out at the time of the incident.  Therefore, the evidence was legally
insufficient to establish that Hendrick breached its duty to provide a
reasonably safe workplace and its duty to furnish reasonably safe
instrumentalities with which its employees were to work by furnishing the
subject cord and plug to Smith.








Smith
also contends that, even if the jury believed that she received the shock
because she touched the prongs of the plug, the evidence was legally and
factually sufficient to support the jury=s
negligence finding.  There was no evidence that the subject cord, plug,
receptacle, or refrigerator were not in good working order at the time of the
incident or that a reasonably prudent employer would have used a different type
of plug, cord, or receptacle.  Smith=s
expert, Baucum, testified that the type of plugs, cords, and receptacles used
by Hendrick met the applicable electric code for the City of Abilene.  Hendrick
tray line employees routinely plugged in and unplugged equipment. Plugging in
and unplugging equipment, such as refrigerators, were tasks performed regularly
by tray line employees as part of their job.  Smith testified that she had
plugged the subject refrigerator back in Aquite
frequently@ before the
date of the incident.  Smith also testified that it was common sense not to
touch the prongs of a plug when you are plugging it in.  Thus, she recognized
the risk involved if a person touches the prongs of a plug while plugging it
into a receptacle.  Baucum also said that it is common sense not to touch the
prongs of a plug when you are plugging it in, and Dorsett said that a person
touching the prongs on a plug while plugging it in can get shocked.  The risk
of electrical shock involved in touching the prongs of a plug while putting the
plug into a receptacle is a matter within common knowledge.  

Because
Smith knew of the risk associated with touching the prongs of a plug while
plugging it into a receptacle and because the risk is commonly known, Hendrick
had no duty to warn Smith of the danger, no duty to provide training to
dissuade her from touching the prongs of a plug while plugging it into a
receptacle, and no duty to adopt safety rules in an effort to prevent Smith
from touching the prongs of a plug while plugging it in.[2] 
Elwood, 197 S.W.3d at 794; Patino, 158 S.W.3d at 660.  For the
same reasons, Hendrick had no duty to provide equipment B such as a GFCI or a twist-lock plug B to prevent Smith from
touching the prongs of the plug or to prevent her from being shocked if she
touched the prongs of the plug.  Elwood, 197 S.W.3d at 794.  Neither
a GFCI nor a twist-lock plug were necessary to the job=s safe performance. 








Additionally,
Smith=s injury
resulted from the same character of work B
plugging in plugs B
that Hendrick tray line employees had always done, and there was no evidence
that plugging in plugs into receptacles while working on Hendrick=s tray line was an
unusually precarious job.  Because Smith=s
injury resulted from the same character of work that Hendrick=s tray line employees had
always done and because there was no evidence that the work was unusually
precarious, Hendrick has no liability to Smith.[3] 
Elwood, 197 S.W.3d at 794.

Smith
stated in two incident reports that she was standing in water when she was
shocked. There was no evidence that water had anything to do with the shock. 
Baucum testified that, if a person is standing in water and plugs a plug into a
receptacle without touching the prongs, the person will not get shocked as long
as everything else is in working condition.  He also testified that, as far as
he knew, everything was working properly at the time of the incident. 
Likewise, there was no evidence that electrical arcing had anything to do with
the incident.  Baucum did not offer any testimony as to whether he believed
electrical arcing had had anything to do with the incident.

                                                                     Conclusion

There
was no evidence that Hendrick breached a duty owed to Smith.  Therefore, the
evidence was legally insufficient to support the jury=s negligence finding.  We sustain Hendrick=s first appellate issue.

This
Court=s Ruling

We
reverse the judgment of the trial court and render judgment that Smith take
nothing by her claims against Hendrick.

 

 

TERRY McCALL

JUSTICE

November 8, 2007

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









[1]There was no direct testimony that the plug and cord
involved in the incident had been replaced.  Smith asserts that, as she stated
in her testimony, the plug she plugged into the outlet was black but that the
plug examined by Baucum and Dr. Russell was white.  Therefore, she contends
that the plug and cord examined by Baucum and Dr. Russell were not the plug and
cord involved in the incident.  While the record is not clear on this point, we
assume for the purposes of our analysis that Hendrick replaced the plug and
cord involved in the incident at some point after the incident and before
Baucum and Dr. Russell inspected the kitchen about four years later.





[2]Smith presented evidence that she probably had an IQ of
70 or 80, which was borderline mentally retarded.  However, the evidence did
not show, and Smith does not contend, that she did not or could not appreciate
the risk involved in plugging in a plug while touching the prongs of the plug. 
Instead, Smith=s testimony established that she recognized the risk.





[3]Although Griewahn testified that tray line employees
were shocked Aseveral times@ a
month, he did not testify as to the details of any of the shocks.  For example,
he did not describe how the shocks occurred.  Thus, there was no evidence that
any other employee received an electrical shock while plugging a plug into a
receptacle.